IN THE SUPREME COURT OF MISSISSIPPI
NO. 92-CA-00690-SCT

*TEREX CORPORATION*

*v.*

*INGALLS SHIPBUILDING, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 3/2/92 |
| TRIAL JUDGE: | HON. BILL JONES |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM N. REED |
| | H. MITCHELL COWAN |
| ATTORNEYS FOR APPELLEE: | WILLIAM T. REED |
| | GEORGE M. SIMMERMAN,JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART, REVERSED AND RENDERED IN PART - 3/28/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/18/96 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. On December 10, 1985, Terex Corporation ("Terex") and Ingalls Shipbuilding, Inc. ("Ingalls") contracted in the amount of $252, 920 for Terex to supply two 10,000 pound terrain diesel powered forklifts to be used on a ship, designated LHD-1, built for the United States Navy. The Navy had very specific criteria for the forklifts and also required extensive, expensive testing on the original forklift built. Included in the contract were options for Ingalls to procure more forklifts from Terex in the event the Navy should award more contracts for LHDs to Ingalls. Ingalls exercised this option in September of 1987. Prior to Ingalls exercising its option, Terex experienced major changes. Northwest Engineering Company acquired Terex and closed Terex's United States manufacturing plant where these specific forklifts were constructed. Terex could no longer build these forklifts, so Terex attempted to locate other forklifts that would meet the specifications. Ingalls discovered a height limitation of 117 inches when they were inspecting one of the replacement forklifts that Terex suggested and the forklift proved to be too tall. In fact, the first

forklift set that Terex built was too tall, but Ingalls modified it accordingly.

¶2. When Ingalls first filed its Complaint, Terex sought protection from the Ohio Bankruptcy Court. The Ohio bankruptcy judge dismissed that case and Terex was ordered by the lower court to pay Ingalls' attorney's fees of $16,478.64. The final amended complaint, filed February 1, 1991, alleged that Terex breached its subcontract with Ingalls in refusing to supply the forklifts and was therefore liable for actual damages in the amount of $227,454. This was the excess amount that Ingalls claimed that it had to pay to procure the forklifts. Ingalls also alleged that Terex acted tortiously and in bad faith when Terex refused to honor the option contract, and when Terex requested the temporary restraining order in bankruptcy.

¶3. The case was tried by a jury in the Jackson County Circuit Court. The jury returned a verdict for Ingalls for $227,454. Terex appeals to this Court arguing that Ingalls' modification of the contract relieved Terex of any obligation to perform; that Ingalls did not purchase reasonably comparable substitute forklifts; that Ingalls failed to satisfy a condition precedent; that the jury's award of damages is contrary to the court's instructions and against the overwhelming weight of the evidence; and that the circuit court erred in refusing to vacate the award of attorney's fees under the Litigation Accountability Act. Ingalls cross-appeals for assessment of prejudgment interest, attorney's fees and costs pursuant to the Litigation Accountability Act of 1988 Miss. Code Ann. § 11-55-1, *et seq,* (Supp. 1995), all of which the trial court denied.

¶4. Issues I - III raised by Terex are without merit and need not be discussed. We address Issue IV which states that the jury's award of damages was contrary to the overwhelming weight of the evidence and that the trial court erred in denying Terex a remittitur and Issue V which is a cross-appeal by Ingalls requesting prejudgment interest and attorneys fees. After a thorough examination of the record and case authority, we find these issues meritorious, thus holding that Terex was entitled to the remittitur and Ingalls was entitled to prejudgment interest.

## STATEMENT OF THE FACTS

¶5. On December 10, 1985, Terex Corporation ("Terex") and Ingalls Shipbuilding, Inc. ("Ingalls") contracted in the amount of $252,920 for Terex to supply two 10,000 pound terrain diesel powered forklifts to be used on a ship, designated LHD-1, built for the United States Navy. The two forklifts are referred to in tandem as a "ship set." Pursuant to Article III of the Special Provisions of the Ingalls purchase order, Terex granted Ingalls options to buy additional ship sets of the forklift for three ships potentially to be constructed by Ingalls for the Navy in the future. Ingalls argued that this was a supply contract which required Terex to either manufacture the units or have the units manufactured by someone else. At the time the purchase order was issued, Terex was the debtor-in-possession in a Chapter 11 bankruptcy proceeding.

¶6. Ingalls states that Terex approached Ingalls at the behest of the Navy, after Ingalls did not receive suitable proposals from potential suppliers. Both parties admit that due to the Navy's specific requirements, these particular forklifts were difficult to locate and/or build. Terex was already building forklifts for the United States Marine Corps and these forklifts were similar to those being specified by the Navy. The forklifts would require modifications, but would save the Navy and Ingalls a portion of the testing costs and the costs necessary to integrate new components into the Navy's spare parts system. This Navy testing process is known as First Article Testing. In addition to the First Article Testing, one of the tests is called a shock test and it alone costs $50,000. This testing process is performed on the first forklift built, and applied to all subsequent units as long as the units are made in strict accordance with the original

specifications.

¶7. Terex manufactured the forklifts at its plant in Hudson, Ohio. On March 31, 1987, the second option period under the purchase order expired without Ingalls having ordered any additional forklifts from Terex. On May 22, 1987, during the third option period, Ingalls and Terex first discussed Ingalls' purchase of two forklifts for a second Navy ship, LHD-2.

¶8. In the meantime, Northwest Engineering Company had purchased Terex. This transaction resulted in the closing of the Ohio plant where Terex built the forklifts. In mid-August, 1987, Terex advised Ingalls that Terex's Ohio plant was closing, that the plant in Scotland was insufficient for this particular purpose, and that other alternate sources of forklifts should be explored. Terex advised Ingalls in writing on September 14, 1987, that Terex could not build the forklifts for LHD-2.

¶9. Gerald Dickinson of Ingalls formally exercised Ingalls' option to order two forklifts for LHD-2 on September 15, 1987. From October 1987 to February 1988 Terex and Ingalls discussed alternative sources for LHD-2 forklifts. Several potential sources of forklifts were investigated by Terex and Ingalls, one of which was a forklift manufactured by John Deere, which measured 131 inches in height.

¶10. The height of the John Deere forklifts raised questions about the suitability of the Terex forklifts for LHD-1, which were already completed and in storage until time to be placed on the ship. That ship set measured 124 inches in height. The close scrutiny of the John Deere forklifts led to the discovery that the forklifts could only be a certain height, a criterion not in the specifications that Terex used to build the first ship set. Some of the doors on the LHD-1 measured 120 inches and the forklift must be able to move unhindered throughout the ship. Ingalls, in February 1988, revised the requirements to include that any replacement forklifts should not exceed a measurement of 117 inches. On the first ship set for LHD-1, Ingalls' engineers lowered the canopy from 124 inches to 117 inches by cutting inches from a portion of the bridge, which is the top of the forklift. An Ingalls employee in the contracts division, Robert Quinn, stated that he thought that the modifications were not significant enough to cause any re-testing. Ingalls asked Terex to pay for the modifications.

¶11. Terex contends that to modify the height of the forklifts for LHD-1 would violate the Society of Automotive Engineers (SAE) safety standards and would therefore not meet Navy approval. For example, on the reduced-canopy forklifts, if the operator is over six feet tall, getting into the compartment would be a tight squeeze and the canopy would rest near the top of his head without any buffer zone. If the operator is taller, the operator would have to duck to drive the forklift. Terex also asserts that approval for the order of the second ship set for LHD-2 must come from the Navy in the form of a condition report and that Ingalls did not have this condition report for LHD-2. Ingalls states that the report was never requested because of Terex's breach.

¶12. Terex also suggested the United States Marine Corps as a possible source from which to procure the substitute forklifts. Another company contacted by Ingalls was Mainline Construction Equipment. Mainline's forklift had a height of 124 inches. Ingalls inquired about whether Mainline could reduce the height. The record does not provide Mainline's answer.

¶13. No suitable substitute was found and on February 16, 1988, Ingalls inquired as to how Terex intended "to fulfill its obligation to Ingalls." Terex's general counsel, Marvin Rosenberg, responded to the demand letter on March 7, 1988, advising Ingalls that (1) Terex did not have the ability to make the forklifts; (2)

Terex was not obligated to make the forklifts because Ingalls had not exercised its option as specified in the Purchase Order; and (3) any claim that Ingalls might have against Terex should be pursued in the bankruptcy court that handled the Terex Chapter 11 proceeding.

¶14. In December, 1988, Ingalls subsequently contracted with Windham Power Lifts to build the forklifts at a cost of $436, 000. Ingalls filed its Complaint on May 23, 1989. The complaint alleged that Terex breached its subcontract with Ingalls and asked for damages in the amount of $227,454. This amount represented the "cover" which was the difference between what Ingalls had to pay to Windham Power Lifts for the forklift for LHD-2 minus the amount Ingalls was contracted to pay Terex.

¶15. Terex filed a Complaint for Declaratory and Injunctive Relief in the Ohio Bankruptcy Court that handled Terex's prior Chapter 11 reorganization. Terex asked the court to enjoin further proceedings in this case and to declare that Terex was excused from performing the Ingalls contract by virtue of § 365 of the Bankruptcy Act. The Ohio Bankruptcy Court enjoined proceedings in this case until May 25, 1990, when it ruled that § 365 did not excuse Terex from performing the Ingalls contract. In a lengthy opinion, the bankruptcy court judge said that if a debtor could "reject a post-petition contract as easily as [a debtor could reject] a pre-petition contract, no reasonable businessman would deal with a chapter 11 Debtor. New Terex's position would undermine the fundamental purpose of chapter 11, to wit: rehabilitation and reorganization." The judge further opined that:

> [i]t is clear the only reason this cause of action occurred is because New Terex refused to complete the contract. The Court can assume that New Terex took this action in what it believed to be its best business judgment. It is apparent to this Court that New Terex was willing to enjoy the fruits of the Contract but now wants this Court to relieve it of the responsibilities of the Contract. . . .

¶16. On June 7, 1990, Ingalls filed a motion for a default judgment and for sanctions in the Jackson County Circuit Court. Ingalls contended that Terex's actions (obtaining the Temporary Restraining Order and then enjoining Ingalls' action) in the bankruptcy procedures in Ohio were without substantial justification and were pursued solely for the purpose of delay or harassment. On July 26, 1990, the court set aside the clerk's entry of default and ordered Terex to pay Ingalls $16,478.64 in attorney's fees. Upon non-payment of attorneys fees, the court issued an order on October 8, 1990, threatening to reinstate the default judgment unless Terex promptly, within ten days, paid the attorney's fees. Terex complied.

¶17. The final amended complaint, filed February 1, 1991, alleged that Terex breached its subcontract with Ingalls in refusing to supply the forklifts and was therefore liable for actual damages in the amount of $227, 454, which was the excess amount that Ingalls had to pay to procure the forklifts for LHD-2. Ingalls also alleged that Terex acted tortiously and in bad faith when Terex refused to honor the option contract, and when Terex requested a temporary restraining order in bankruptcy.

¶18. Both sides presented their respective cases at trial in Jackson County which resulted in a jury verdict in favor of Ingalls in the amount of $227, 454. Terex appealed this verdict arguing that Ingalls' modification of the contract relieved Terex of any obligation to perform; that Ingalls did not purchase reasonably comparable substitute forklifts; that Ingalls failed to satisfy a condition precedent; that the jury's award of damages is contrary to the court's instructions and against the overwhelming weight of the evidence; and that the circuit court erred in refusing to vacate the award of attorney's fees under the Litigation Accountability Act. Ingalls cross-appealed on the issue of the trial court's denial of assessment of prejudgment interest, attorney's fees and costs pursuant to the Litigation Accountability Act of 1988 (Miss.

Code Ann. 11-55-1, *et seq,* (Supp. 1995)).

## STANDARD OF REVIEW

¶19. The goal of the cover remedy is to place the buyer only in as good a position as he would have occupied had the seller performed. *Fedmet Trading Corp. v. Ekco Int'l Trade Corp.*, 574 N.Y. S.2d 122, 124 (Sup. Ct. 1991); Miss. Code Ann. § 75-1-106(1) (1972). This Court has held that:

> Once the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of a conclusion on our part that given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found.

*Wells Fargo Armored Service Corp. v. Turner*, 543 So. 2d 154, 157 (Miss. 1989); *Bell v. City of Bay St. Louis,* 467 So. 2d 657, 660 (Miss. 1985); *Stubblefield v. Jesco, Inc.,* 464 So. 2d 47, 54(Miss. 1984); *Weems v. American Security Insurance Co.,* 450 So.2d 431, 435 (Miss. 1984).

## DISCUSSION OF LAW

### WHETHER THE JURY'S AWARD OF DAMAGES IS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE SUCH THAT THE TRIAL COURT ERRED IN DENYING TEREX A REMITTITUR.

¶20. This Court has stated that "unless it is clear to this Court that the verdict is contrary to the overwhelming weight of the credible testimony, this Court will not set aside the verdict of a jury." *Wells Fargo Armored Service Corp. v. Turner*, 543 So. 2d 154, 156 (Miss. 1989)(quoting *Travelers Indemnity Co. v. Rawson,* 222 So. 2d 131, 134 (Miss. 1969)). Terex asserts that this verdict is against the overwhelming weight of the evidence. Terex contends that it presented undisputed testimony in regard to its claim that the forklifts, as Ingalls modified them, would not meet SAE safety standards, which could incur potential products liability claims against Terex. Ingalls' witness, John Neblett, testified that he was not very familiar with the SAE safety requirements in question and did not know whether the requirements were met.

¶21. Though this undisputed fact is something that the jury takes into consideration, the jury must consider the evidence as a whole. This Court has held that

> [o]nce the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of a conclusion on our part that given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found.

*Wells Fargo Armored Service Corp. v. Turner*, 543 So. 2d 154, 157 (Miss. 1989); *Bell v. City of Bay St. Louis,* 467 So. 2d 657, 660 (Miss. 1985); *Stubblefield v. Jesco, Inc.,* 464 So. 2d 47, 54 (Miss. 1984); *Weems v. American Security Insurance Co.,* 450 So.2d 431, 435 (Miss. 1984). When the facts are close in a case as they are in this case, the jury is given the power to resolve factual disputes and this jury did so in favor of Ingalls. A "reasonable, hypothetical juror" could have returned a verdict as this one did. However, it appears that the jury overlooked the fact that Ingalls actually saved a substantial

amount from the breach.

¶22. Terex asserts that Ingalls actually saved $96,074 from the breach, and points to the fact that the costs for testing, approximately $153,000, were all allocated to the first two forklifts built by Windham, not budgeted to each of the four other forklifts that Ingalls eventually purchased from Windham. Therefore, Ingalls is recovering from Terex all the testing costs associated with those two forklifts even though the non-recurring tests applied to all six Windham forklifts. Terex argued this at trial, but for the purposes of this appeal, Terex is only challenging the jury award based on the fact that Ingalls saved $96,074 on four forklifts for LHD-3 and LHD-4 because the *per unit cost* of those forklifts was less than the Terex units. Terex claims that the jury cannot ignore undisputed evidence that Ingalls saved money by purchasing the four additional forklifts from Windham. Terex submitted the following formula which corresponds numerically with calculations in Ingalls' exhibits..

**LHD-2 <u>Cost of 2 forklifts</u> <u>Non-recurring</u> <u>Total</u>**

**<u>test cost</u>**

Windham $166,000 $270,000 $436,000

Terex $208,546 -0- <u>$208,546</u>

Difference $227,454

**LHD-3 and 4 <u>Cost of 4 forklifts</u>**

Terex $432,074(Dec. 1988 price)

Windham - <u>$336,000</u>

Total forklift cost saved $ 96,074

Storage expense saved + <u>$ 1,900</u>

Total expenses saved $ 97, 974

Ingalls Net Loss from Terex's breach is : $227,454 (jury award)

- <u>$ 97,974</u> (savings)

$129,480

¶23. Ingalls argues that Terex made the tactical decision at trial to attempt to avoid responsibility for the entire amount for which Ingalls sued, and did not make an effort to produce witnesses to question the amount sought. Ingalls says that Terex claimed complete absence of responsibility at trial and is now appealing on the basis that the jury should have awarded less damages. Ingalls contends that Terex gambled at trial and lost, relying on the "no damages" theory, or paying, at most, $47,000.

¶24. Therefore, we should examine Ingalls' claim closely. In the opening statement, counsel for Terex said that Terex was excused from performing and Ingalls was entitled to nothing. However, Terex did continue and argue that Ingalls actually saved money when it exercised its other options with Windham for LHD-3

and LHD-4. In the closing argument Terex argued, not the exact figures in the chart above, but that the expenses of the testing should be allocated over the other forklifts purchased from Windham. Terex also cited to the savings created by the cost difference between Windham and Terex for LHD-3 and 4. After trial, Terex made a Motion for Remittitur, j.n.o.v. or a New Trial in which Terex specifically demonstrated the savings that Ingalls incurred on LHD-3 and 4 as a result of the Terex breach.

¶25. Hypothetically, if Ingalls had exercised the Terex options for LHD-3 and 4, the total cost for both would have been $432,074. The Windham option for LHD-3 and 4 totaled $336,000. The difference in what Ingalls paid Windham and what Ingalls would have paid Terex is $96,074. Terex contends that Ingalls also saved storage costs in the amount of $1,900, bringing the total saved to $97,974. Terex relies on the language in Miss. Code Ann. § 75-2-712 which states:

> (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (§ 2-715)[§ 75-2-715], *but less expenses saved in consequence of the seller's breach* (emphasis added).

Therefore, Terex appeals for a remittitur in the amount of $97,974. Exhibits submitted to the jury show that Ingalls did, in fact, pay less for the forklifts for LHD-3 and 4 than it would have had Ingalls been able to purchase the forklifts from Terex as it was obligated to do. Admittedly, Terex did not focus on this issue at trial as much as it does in the Motion for a Remittitur, but it was introduced into evidence and commented upon during argument by the attorneys.

¶26. In defense of its damage award, Ingalls argues that, at the time, this trial just concerned the forklifts for LHD-2, the ones Terex refused to build, and that LHD-3 and 4 are not to be considered. Ingalls claims that Terex is attempting to reap the benefits from events that have occurred since the breach, and that it is another after-the-fact defense. Ingalls contends that the difference in cost was not caused by anything Terex did, but was caused by the breach itself. This type situation seems to be what Miss. Code Ann. § 75-2-712 contemplates when it allows for "expenses saved in consequence of the seller's breach." Ingalls declares that it is "not fair" to consider LHD-3 and 4 and that the jury obviously did not consider the other Windham options for LHD-3 and 4 when deliberating. Ingalls argues that the jury verdict was supported by credible evidence and should be affirmed. Ingalls cites numerous cases supporting the sacredness of the jury verdict, including *Dixon v. State*, 519 So. 2d 1226, 1228 (Miss. 1988), which held that:

> [t]he jury may give whatever weight it chooses to a witness' testimony or other evidence. The reviewing court cannot, therefore, set aside a verdict unless it is clear that the verdict is a result of prejudice, bias or fraud, or is manifestly against the weight of the credible evidence.

¶27. As to the procedural aspects of a remittitur, this Court has held that:

> [w]here the trial court has denied a remittitur, the defendant may appeal to this court on grounds the trial court abused its discretion in failing to order the remittitur, and, if he can convince the court on that score, may argue that the damage award be reduced to such amount as would no longer be contrary to the overwhelming weight of the credible evidence. If the defendant should be successful, to any extent, the plaintiff would then have the option of accepting the remittitur or going to trial again on the issue of damages only.

***Odom v. Roberts***, 606 So.2d 114, 121-22 (Miss. 1992). Miss. Code Ann. § 11-1-55 allows the court to impose a remittitur if the "damages awarded were contrary to the overwhelming weight of the credible evidence." This statute also sets out the procedural remedies open to the party opposing the remittitur. If the party chooses not to accept the remittitur, "then the court may direct a new trial on damages only." Miss. Code Ann. § 11-1-55 (1972).

¶28. In the present case, the numbers show that Ingalls, as a consequence of the breach by Terex, in the end, did not pay as much as it would have had Terex honored the contract. The "overwhelming weight of the credible evidence standard is an objective [standard]." ***Green v. Grant***, 641 So. 2d 1203, 1208 (Miss. 1994). This is a situation where the mathematics reveals that Ingalls did actually benefit as a consequence of the breach. Additionally, as the results now stand, Ingalls has hired Windham to design and construct exactly what was necessary to fulfill the Navy requirements, a 117 inch forklift, and is attempting to charge this oversight to Terex.

¶29. Exhibits presented at trial reveal that Ingalls saved $96,074 by dealing with Windham. Terex also asks that saved storage costs be allocated in the remittitur. The record does not prove that these costs were actually saved. The record is devoid of any information as to whether Ingalls paid storage costs for the Windham forklifts at some point, so due to the uncertainty of this, the storage costs are excluded from the remittitur. The jury award as it stands is $227,454. This Court grants a remittitur in the amount of $96,074, lowering the damage award to $131,380, which is a more accurate assessment of what Ingalls actually lost as a consequence of Terex's breach of contract.

### WHETHER THE TRIAL COURT ERRED IN DENYING INGALLS PRE-JUDGMENT INTEREST AND ATTORNEYS FEES.

¶30. In its Cross-Appeal, Ingalls challenges the trial court's post-trial refusal to award prejudgment interest as extra-contractual damages and refusal to award attorneys fees pursuant to the Litigation Accountability Act of 1988 (Miss. Code Ann. § 11-55-1, *et seq,* (Supp. 1995). Ingalls lists several reasons supporting the award of prejudgment interest including: (1) Terex had the alternative of having the forklifts manufactured elsewhere and supplying the forklifts to Ingalls thereby avoiding the testing and integration costs; (2) Terex caused the action to be stayed in Ohio Bankruptcy Court for almost a year, before it was dismissed with that court citing lack of subject matter jurisdiction and the judge indicating that he thought Terex was attempting to avoid its obligation under the contract; and (3) The jury, on February 21, 1992, returned a verdict for $227, 454, the exact amount first demanded on April 13, 1989.

¶31. In ***City of Mound Bayou v. Roy Collins Constr. Co.***, 499 So. 2d 1354, 1361 (Miss. 1975), this Court upheld an award of prejudgment interest where the city and its consulting firm had not paid the contractors even thought the contractors had submitted all the paperwork required and had completed all the work. ***Mound Bayou***, 499 So. 2d at 1361. The prejudgment interest award dated from the date that the consulting firm accepted the project to the day the trial commenced in chancery court. ***Id.*** But the Court did note in ***Mound Bayou*** that further such actions involving contractors and payments due them would be governed by Miss. Code Ann § 31-5-25 (Supp. 1985) which was a prospectively applied provision addressing interest on past due contract payments.

¶32. Ingalls, while recognizing that the primary focus of the law in this area concerns bad faith insurance claims, contends that as extra-contractual damages for breach of the contract, pre-judgment interest is allowable under Mississippi law in the discretion of the trial judge where the amount due is liquidated when

the claim is originally made or where the denial of the claim is frivolous or in bad faith. ***Sunburst Bank v. Keith***, 648 So. 2d 1147, 1152 (Miss. 1995); ***Simpson v. State Farm Fire and Cas. Co.***, 564 So. 2d 1374, 1380 (Miss. 1990); ***Aetna Cas. & Sur. Co. v. Doleac Elec. Co.,*** 471 So. 2d 325, 331 (Miss. 1990). To determine if the case *sub judice* qualifies for prejudgment interest, we must ask (1) were the damages liquidated? and (2) was the claim frivolous or in bad faith? Different damage theories were presented to the jury and the jury's acceptance of Ingalls' damage argument does not mean that the damages were therefore liquidated. *See **Warwick v. Matheney***, 603 So. 2d 330, 342 (Miss. 1992) (holding that trial court's refusal to award prejudgment interest should be upheld where there were several contested issues regarding measure damages). As to the frivolousness or bad faith of Terex's refusal to pay, there was no finding of bad faith by the trial judge. Terex presented substantial credible evidence to support its defenses and that evidence, along with supporting jury instructions, was submitted to the jury. The jury's rejection of Terex's position does not amount to a finding of bad faith.

¶33. This Court recently addressed factors involved in awarding prejudgment interest. *See **Hans Constr. Co. v. Drummond***, 653 So. 2d 253 (Miss. 1995); ***Sunburst Bank v. Keith***, 648 So. 2d 1147 (Miss. 1995). ***Hans*** addressed the prejudgment interest question under a two-part format which involved determining whether there was a liquidated amount due or whether a frivolous or a bad faith denial of a claim existed. ***Hans***, 653 So. 2d at 264. The parties' testimony raised questions as to the amount that was owed. Due to this uncertainty as to the amount of damages, the award for prejudgment interest could not be based upon a liquidated amount. No adequate evidence existed of a frivolous or bad faith denial of the claim upon which to base an award of prejudgment interest. Therefore, since the scenario in ***Hans*** failed both prongs of the test, this Court held that the judge had abused her discretion in awarding prejudgment interest and reversed as to that issue. ***Id.*** at 264.

¶34. Prejudgment interest "is not imposed as a penalty for wrong doing; it is allowed a compensation for the detention of money overdue. ***Sunburst Bank v. Keith***, 648 So. 2d 1147, 1153 (Miss. 1995); ***Rubel v. Rubel***, 75 So. 2d 59, 69 (Miss. 1954). This Court has allowed prejudgment interest at the legal rate in insurance cases where, in the absence of statutory authority, punitive damages were justified. ***Valley Forge Ins./CNA v Strickland***, 620 So. 2d 535, 542 (1993). The present case is not analogous in that punitive damages are not in issue. We have held that "the prevailing party in a breach of contract suit is entitled to have added legal interest on the sum recovered, computed from the date of breach of the contract to the date of the decree." ***Stockett v. Exxon Corp.***, 312 So. 2d 709, 712 (Miss. 1975) (citing ***Rubel v. Rubel***, 75 So. 2d 59 (Miss. 1954)). In the case at bar, the jury found that Terex breached the contract. We affirm the judgment entered against Terex, recognizing a breach of contract by Terex, but modifiy the damage award accordingly.

¶35. Yet, the decision to award prejudgment interest rests within the discretion of the trial judge. ***Warwick v. Matheney***, 603 So. 2d 330, 342 (Miss. 1992). As mentioned above, there was no explicit finding of bad faith by the trial judge. The Ohio bankruptcy judge was the one who wrote in his Order that, in his opinion, this cause of action in bankruptcy occurred because Terex refused to complete the contract and that Terex was willing to enjoy the fruits of the contract but wanted the Court to relieve it of the responsibilities of the contract. The trial judge did not adopt this statement by the Ohio judge. However, the fact remains that Terex filed the Ohio action in an attempt to delay or thwart the Mississippi action. Based on this, we find it proper to award prejudgment interest from the date of the breach of the contract to the date of the lower court decree.

¶36. With respect to Ingalls' claim that Terex should pay Ingalls' attorneys fees, Terex responds that there is no authority in Mississippi for an award of attorneys fees in a breach of contract case absent express contractual language providing for attorneys fees or a finding of outrageous conduct that would support an award of punitive damages. *Greenlee v. Mitchell*, 607 So. 2d 97, 108 (Miss. 1992); *Central Bank of Mississippi v. Butler*, 517 So. 2d 517, 512 (Miss. 1987). In the present case, the contract did not provide for the recovery of attorneys fees. To award this under the Litigation Accountability Act would be within the discretion of the trial judge. There is absolutely nothing in the record to indicate that the trial judge abused his discretion in deciding not to award attorneys fees.

¶37. The dissent cites to *Universal Life Insurance Co. v. Veasly,* 610 So. 2d 290 (Miss. 1992). The portion of *Veasly* that the Terex dissent quotes from is as follows.

> Some justices on this court have suggested that extra-contractual damages ought be awarded in cases involving a failure to pay on an insurance contract without an arguable reason even where the circumstances are not such that the punitive damages are proper.

*Veasly* at 295; *quoting Pioneer Life Insurance Company of Illinois v. Moss*, 513 So. 2d 927, 932 (Miss. 1987)(Sullivan, J., concurring). This is a fact specific suggestion of award of attorney's fees. In *Veasly,* this Court goes on to say

> anxiety and emotional distress would ordinarily follow the denial of a valid claim, especially in the area of life insurance where the loss of a loved one is exacerbated by the attendant financial effects of that loss. Additional inconvenience and expense, attorneys fees and the like should be expected in an effort to have the oversight corrected. It is no more than just that the injured party be compensated for these injuries.

*Veasly*, 610 So. 2d at 295.

¶38. In Terex, we have a vastly different situation. No one died here. This is a case where Terex mounted an articulate, cogent defense as to whether or not they were liable for the cost of the full replacement value of the forklifts. These defenses involved the inequality of the "cover" Ingalls obtained, the presence of a condition precedent, and the fact that the Terex forklifts, constructed exactly as Ingalls ordered, had to be modified to fit in Ingalls' ships and modified in such a way that Terex felt it was exposed to a potential products liability claim. The dissent claims that contract liability is not disputed. This is not so. At trial, several of Terex's aforementioned defenses, if the jury had adopted them, would have resulted in no liability on Terex's part.

¶39. This is a breach of contract action, not a denial of a valid life insurance claim as in *Veasly*. Terex had already paid Ingalls $16,478.64 in attorney's fees related to the Ohio bankruptcy action in order to reinstate the action in Jackson County Circuit Court. The dissent mentioned "frivolous delay tactics" and it is the majority's position that Terex paid for that delay when Terex reimbursed Ingalls $ 16,478.64 for its attorney's fees in the Ohio Bankruptcy Court action. Otherwise, a suit in Jackson County Circuit Court, where Terex was able to raise the defenses mentioned above and point out that there were available replacements but none anywhere in the world that would meet Ingalls' new 117 inch height limitation, is a viable method of resorting to the courts and juries to settle a dispute. That action cannot be considered "frivolous delay tactics." Terex did delay the start of the Jackson County case and, in turn, paid for it. But a trial on the merits is not "harassment" as the dissent suggests in order for Ingalls to be eligible for the

compensation that Miss. Code Ann. § 11-55-5 (Supp. 1995) has to offer.

## CONCLUSION

¶40. Most of Terex's arguments were issues of disputed fact, which were properly resolved by the jury. This is a "which came first, the chicken or the egg?" case. Terex might have fulfilled the contract had Ingalls not insisted upon that particular Terex forklift and then refused to consider any potential substitutes after Ingalls discovered the 117 inch height limitation.

¶41. But then, if Terex had built the forklifts in the first instance and not breached, then this case would not be here in this form. Although a close call, the jury has spoken. We affirm the jury verdict as to the decision that Terex breached the contract and is therefore at fault. Likewise, Terex's attempt to escape to the bankruptcy court in Ohio delayed the action considerably in Mississippi, which, while not being frivolous or in obvious bad faith, is playing fast and loose with the system, resulting in a prejudgment interest award as "a compensation for the detention of money overdue." *Sunburst Bank v. Keith*, 648 So. 2d 1147, 1153 (Miss. 1995); *Rubel v. Rubel*, 75 So. 2d 59, 69 (Miss. 1954)). There being no merit to the remaining issues, therefore, the trial court judge's decision to deny attorneys fees to Ingalls and his decision to deny Terex a refund of the sanctions imposed before the trial began are both affirmed.

¶42. However, this Court finds that Ingalls was in a better position (in that it acquired forklifts that fit the exact specifications as modified) than it would have been in had Terex performed. As in *Martella v. Woods,* 715 F.2d 410, 413 (8th Cir. 1983), the buyer, Ingalls, was only entitled to cover what the seller, Terex, had to sell. Terex, if the company had been building forklifts at that time, would have had 124 inch forklifts to sell. Ingalls purchased 117 inch forklifts and charged the difference to Terex.

¶43. When Ingalls negotiated with Windham to build the 117 inch forklift, Ingalls proceeded to include options for future forklift needs, just as it had with Terex. However, Ingalls got a better deal with Windham for the future options for LHD-3 and 4. Thus Ingalls saved money as a consequence of Terex's breach. This case turns on whether this savings should be included when computing the damages caused by the breach. Miss. Code Ann. §75-2-712 (1972) in defining "cover" indicates that expenses saved in consequence of the seller's breach should be subtracted from the overall award. Based on the costs reflected in the record and exhibits, Ingalls paid $96,074 less for four Windham forklifts than it would have for four Terex forklifts. This Court therefore grants a remittitur in the amount of $96,074., which would lower the damage award to be $131,380, an amount that is a more accurate assessment of Ingalls' actual damages resulting from Terex's breach of contract. Terex has "the option of accepting the remittitur or going to trial again on the issue of damages only." *Odom*, 606 So. 2d at 122.

**¶44. ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND RENDERED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. THIS COURT GRANTS A REMITTITUR OF $96,074.**

**ON CROSS APPEAL: AFFIRMED AS TO THE DENIAL OF ATTORNEYS FEES. REVERSED AND RENDERED AS TO THE DENIAL OF PREJUDGMENT INTEREST TO INGALLS.**

**SULLIVAN, P.J., PITTMAN, BANKS, ROBERTS AND MILLS, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY. McRAE, J., DISSENTS WITH SEPARATE OPINION.**

**PRATHER, P.J., NOT PARTICIPATING.**


**McRAE, JUSTICE, DISSENTING:**

¶45. Because the majority improperly rewards Terex for its willful breach of contract, I respectfully dissent. An award of attorneys' fees and prejudgment interest was appropriate under the circumstances of this case since Terex had no arguable defense to this successful claim for willful breach of contract.

¶46. An award of prejudgment interest is permitted when the amount due is liquidated, or if the denial of the claim is frivolous or in bad faith. *Simpson v. State Farm Fire & Cas*., 564 So. 2d 1374, 1380 (Miss. 1990); *Aetna Cas. & Sur. Co. v. Doleac Elec. Co.*, 471 So. 2d 325, 331 (Miss. 1985); *City of Mound Bayou v. Roy Collins Constr. Co.*, 499 So. 2d 1354, 1361 (Miss. 1986). "[T]he prevailing party in a breach of contract suit is entitled to have added legal interest on the sum recovered computed from the date of the breach of contract to the date of the decree." *Stockett v. Exxon Corp.*, 312 So. 2d 709, 712 (Miss. 1975).

¶47. The facts of this case reveal that it was an abuse of discretion by the trial court to deny an award of prejudgment interest. Although there was some dispute as to the amount of damages owed, Terex never denied that it breached its supply contract with Ingalls. Terex closed its plant knowing that it had a contract to supply forklifts to Ingalls. Even more egregious, however, Terex failed to provide substitute products when Ingalls chose to exercise its option. It simply directed Ingalls to explore alternate sources as if no contract existed. Terex then resorted to filing for bankruptcy after Ingalls was forced to file a lawsuit to protect its rights. The bankruptcy judge denied bankruptcy status finding Terex filed only for the purpose of avoiding contract obligations. The bankruptcy judge stated, "Terex was willing to enjoy the fruits of the Contract but now wants this Court to relieve it of the responsibilities of the Contract." Prejudgment interest on the amount ultimately awarded is proper under the circumstances of this case because the breach of contract was willful, and the denial of the claim was made in bad faith. Terex would be unjustly enriched were they not required to compensate Ingalls for prejudgment interest on the amount awarded.

¶48. This Court has also suggested that extra-contractual damages are proper where an insurance company refuses to pay on the insurance contract even though the facts are not sufficient to award punitive damages. *Universal Life Ins. Co. v. Veasely*, 610 So. 2d 290, 295 (Miss. 1992). This proposition should be equally applicable to the specific facts of this case in which Terex wilfully failed to fulfill its duties under a contract. The majority is unpersuasive in its attempt to distinguish *Veasley*. The majority fails to realize that the denial of a valid life insurance claim is tantamount to a breach of contract. Distinguishing *Veasley* on the basis that no one died in the case *sub judice* is insignificant. The wilfulness of the breach remains the determining factor for extra-contractual damages. The facts demonstrate that after an unsuccessful attempt to sidestep its obligations in bankruptcy court, Terex asserted a haphazard defense based on Ingalls' use of the forklifts **subsequent to delivery and performance of contract obligations.** Regardless of the subject matter of this case, it is evident from the face of the pleadings that Terex had no arguable defense.

¶49. Attorneys' fees should be awarded when a claim or defense is exerted for harassment or delay, or where the proceedings are unnecessarily expanded as they were in this case. *See* Miss. Code Ann. § 11-55-5 (Cum. Supp. 1995). It was reasonably foreseeable that Ingalls would incur additional attorneys' fees

in its effort to bring Terex's frivolous delay tactics to an end. They should be entitled to reimbursement for expenditures which were necessary to endure the remaining portion of Terex's scheme of delay and harassment.

¶50. Ingalls properly requested the court below for an award of attorneys' fees and prejudgment interest, and the trial judge abused his discretion in denying Ingalls compensation for those items. I would also affirm as to the cover damages. The majority played juror again. Ingalls should at least be granted the same option as Terex to agree to a new trial. Accordingly, I dissent.