# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-01610-SCT

*IN THE MATTER OF MISSISSIPPI MEDICAID PHARMACEUTICAL AVERAGE WHOLESALE PRICE LITIGATION: SANDOZ, INC.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/06/2012 |
| TRIAL JUDGE: | HON. THOMAS L. ZEBERT |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOSEPH ANGLAND |
| | MICHAEL JOHN GALLAGHER |
| | LUTHER T. MUNFORD |
| | RICHARD T. LAWRENCE |
| | J. COLLINS WOHNER, JR. |
| ATTORNEYS FOR APPELLEE: | CHARLES G. COPELAND |
| | REBECCA SUZANNE BLUNDEN |
| | GEOFFREY C. MORGAN |
| | GEORGE W. NEVILLE |
| | ANDY LOWRY |
| | ELLEN PATTON ROBB |
| | SAMUEL MARTIN MILLETTE |
| | D. RONALD MUSGROVE |
| | BLAKE DAMON SMITH |
| | MICHAEL SHELTON SMITH, II |
| | WILSON DANIEL "DEE" MILES, III |
| | H. CLAY BARNETT, III |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED. |
| | ON CROSS-APPEAL: AFFIRMED - 10/29/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1. The State of Mississippi brought a civil action against generic pharmaceutical provider Sandoz, Inc., (Sandoz) alleging that Sandoz impermissibly exploited Mississippi's Medicaid reimbursement program by routinely and exponentially reporting fictitious "Average Wholesale Prices," a key data factor in the federally supervised formula used by the Mississippi Division of Medicaid to reimburse pharmacies serviced by Sandoz. The trial court, sitting as fact-finder, found Sandoz in violation of the Mississippi Consumer Protection Act and liable for common-law fraud. Sandoz appeals, and the State cross-appeals. On our deferential standard of review, we affirm the trial court in full.

## FACTS AND PROCEEDINGS BELOW

¶2. Medicaid is a joint state-federal program servicing hundreds of thousands of Mississippians. Following the passage of the Omnibus Budget Reconciliation Act of 1990 (OBRA '90), which governs Medicaid, the number of prescription drugs eligible for reimbursement rose from approximately 1,800 to more than 65,000. More than 900 pharmacies eventually participated, submitting more than one million reimbursement claims per month. The cost to each pharmacy for each drug from providers like Sandoz changed on virtually a daily basis and varied depending on the location and nature of the pharmacy.

¶3. For the relevant damages period, Mississippi Medicaid was required by regulation to reimburse pharmacies the lesser of (1) the Estimated Acquisition Cost (EAC) of the drug plus a reasonable dispensing fee, or (2) the "usual and customary" price the pharmacy charges to consumers paying for the drug without government assistance (U&C). 42 C.F.R. §

2

447.512(b).[1] Federal Regulations defined EAC as Medicaid's "best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drugs most frequently purchased by providers."

¶4. The federal agency responsible for Medicaid is the Center for Medicare and Medicaid Services (CMS), formerly known as the Health Care Financing Administration (HCFA). CMS was required to approve of Mississippi's "State Plan," including its reimbursement formula for prescription drugs. Any changes to Mississippi's reimbursement rate had to be approved by CMS. From May 1, 1990, to March 31, 2002, Mississippi Medicaid defined EAC as the Average Wholesale Price minus ten percent. From April 1, 2002, to June 30, 2005, EAC was defined as AWP minus twelve percent. From July 1, 2005, until October 2005, EAC was defined as (1) the lesser of AWP minus twelve percent or Wholesale Acquisition Cost (WAC) plus nine-percent for brand named drugs and single-source generic drugs, and (2) AWP minus twenty-five percent for multiple-source generic drugs.

¶5. To satisfy its regulatory obligations and to efficiently process the large number of reimbursement claims, Mississippi, similar to more than forty other programs nationwide, obtained the drugs' AWPs from national data service First Data Bank. First Data Bank defined AWP as "the average price paid by the pharmacy to the wholesaler for a particular drug." Sandoz generated and submitted the AWPs for its drugs to First Data Bank. Sandoz

---

[1] For the relevant damages period, U&C was employed for only eight percent of reimbursement claims. Reimbursement was also sometimes based on the "Federal Upper Limit," defined at 150 percent of the lowest published number for a generic equivalent.

does not dispute that the AWPs it reported to First Data Bank never represented the net average wholesale prices that Sandoz received for the sale of a particular drug to a pharmacy or wholesaler, or that Mississippi Medicaid relied on Sandoz's AWPs as published by First Data Bank to determine the EAC for purposes of reimbursing pharmacies for the ingredient cost of Sandoz's drugs. The discrepancy between the actual cost of the drug and the reported Average Wholesale Price averaged 886%.

¶6.    Mississippi filed suit in 2005, alleging that Sandoz's conduct of reporting inflated AWPs caused Mississippi to reimburse pharmacies excessive amounts, and that Sandoz deliberately created and marketed the discrepancy (or "spread") between the actual prices of their drugs and the reported AWPs in order to increase market share and profit.[2] The State asserted that Sandoz violated the Mississippi Consumer Protection Act, the Mississippi Medicaid Fraud Control Act, and that its conduct constituted commonlaw fraud. Sandoz argued that the reported AWPs were understood by all parties to be an essentially fictitious sticker price that had no relation to the actual cost of the drugs.

¶7.    In April 2011, the trial court heard more than ten days of testimony, including more than twenty witnesses. This evidence included the testimony of both parties' experts, the testimony of Jack Lee, Mississippi Medicaid's Director of Pharmacy; the testimony of Helen Wetherbee, former Director of Mississippi Medicaid; the deposition testimony of Larry Reed, Technical Director for CMS's Division of Pharmacy; reports from the Office of Inspector

---

[2] The suit initially was filed against some eighty-six drug companies, most of which have settled. Sandoz was known as Geneva Pharmaceuticals, Inc., until 2003.

General (OIG); and First DataBank's definitions of AWP from 1991 to 2003. Additional relevant facts are discussed below.

¶8. The court entered its amended findings of fact and conclusions of law on October 4, 2011, finding that Sandoz committed common-law fraud and violated the Mississippi Consumer Protection Act. For the damages period of January 1, 1991, through October 20, 2005, the court awarded $23,661,618 to cover the amount Mississippi Medicaid overpaid in reimbursements to pharmacies, $2,699,000 in civil penalties under the Consumer Protection Act, and $3,750,000 in punitive damages for Sandoz's willful and fraudulent misconduct. The court dismissed the claims against Sandoz under the Mississippi Medicaid Fraud Control Act and denied the State's post-trial motion for attorney's fees, prejudgment interest, and other relief. Sandoz appealed, and the State cross-appealed.

**DISCUSSION**

¶9. We will not reverse the trial court's findings of fact unless manifestly wrong or clearly erroneous. ***Puckett v. Stuckey***, 633 So. 2d 978, 982 (Miss. 1993). "When a trial judge sits without a jury, this Court will not disturb his factual determinations where there is substantial evidence in the record to support those findings." ***Transoacean Enter. v. Ingalls Shipbuilding, Inc.***, 33 So. 3d 459, 462 (Miss. 2010) (citation omitted). "Fraud is essentially a question of fact best left for the [fact-finder]. . ." ***Allen v. Mac Tools, Inc.***, 671 So. 2d 636, 643 (Miss. 1996). The nine elements of common-law fraud are:

> (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the

hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.

*Franklin v. Lovitt Equip. Co., Inc.*, 420 So. 2d 1370, 1373 (Miss. 1982). Each element of fraud must be proven by clear and convincing evidence. *Cotton v. McConnell*, 435 So. 2d 683, 685 (Miss. 1983).[3]

¶10.    For both the State's common-law fraud and Consumer Protection Act claims, the primary issue of fact determined below was the parties' understanding of the meaning of the term "Average Wholesale Price" as this phrase was used for purposes of pharmaceutical reimbursement by the Mississippi Division of Medicaid. The trial court found clear and convincing evidence supporting that the State understood the Average Wholesale Price data generated by Sandoz to be related to the pharmacies' actual drug acquisition cost, that the State reasonably relied on this data to calculate its best estimate of the actual cost of the drugs to the pharmacies, that Sandoz intentionally reported fictitious prices that had zero relationship to the actual cost of the drug while knowing that Medicaid programs used these prices to estimate how much they should reimburse pharmacies, that Sandoz advertised to pharmacies the discrepancies between the actual and fictitious prices to attract business, and that Medicaid reasonably relied on the false data, reimbursing pharmacies $23,661,618 in

_____

[3] The dissent, along with reweighing the credibility of the evidence in contravention of the manifest-error standard of review, adopts an outlier position in its evaluation of the elements of fraud. Even states that have found that their respective Medicaid programs had sufficient knowledge of the level of local inflation to defeat claims of fraud still found the represented AWPs to be false, misleading, and deceptive. *Sandoz, Inc., v. Commonwealth ex rel. Conway*, 405 S.W 506, 511 (Ky. Ct. App. 2012); *see also AstraZeneca LP v. State*, 41 So. 3d 15 (Ala. 2009) (Alabama Medicaid had internal pricing studies on 80% of its pharmacies, compared here to Mississippi's sample survey of three pharmacies).

excess of the regulatory minimum. We find that the State presented evidence sufficient to have enabled the trial court to have found the elements of fraud by clear and convincing evidence.

¶11. The court was confronted with evidence demonstrating the significant changes Mississippi Medicaid's pharmacy division faced following the enactment of OBRA 90, including a shift in the most frequently applied reimbursement formula to calculate the lowest reimbursement rate reasonably possible for the new open formulary. Rather than most frequently reimbursing the "usual and customary" price the pharmacy charges to consumers paying for the drug without government assistance, Medicaid now reimbursed most often by its best estimate of the acquisition cost plus a reasonable dispensing fee. The reported Average Wholesale Price was a data factor in 100 percent of reimbursements made under this method. Sandoz generated and reported its AWPs to First DataBank, to which Medicaid, along with forty-five other similar programs, subscribed.[4]

¶12. Helen Wetherbee, the Executive Director of the Division of Medicaid from 1991 to 1999, described in detail the limited resources available to the pharmacy division of Mississippi Medicaid at the time it was tasked with implementing the new reimbursement policies under OBRA 90 and after. This description included the necessity of relying on First DataBank for reported AWPs and the impossibility of surveying pharmacists to get invoice

---

[4] The dissent misleadingly focuses on Medicaid's "decades" of prior knowledge that AWPs needed a discount to arrive at a literally accurate number. This is undisputed. The question for the relevant damages period became the level of knowledge of the degree of inflation. Moreover, for the first four years of OBRA '90's enactment, reimbursement discounts were frozen by federal law.

prices for each drug before reimbursement. The pharmacy division was staffed with two people in program integrity and three people in program services. She testified that there was "no practical alternative" to obtaining prices other than subscribing to First DataBank:

> We didn't have the computer resources to do that. We certainly didn't have the staff to do anything manually. First DataBank was the national standard, the gold standard, if you will, and so I felt very comfortable relying on First DataBank as being the best possible way I knew to serve the Medicaid program and get prompt, accurate information with respect to pharmacy product pricing.

The trial court agreed, stating that Medicaid's decision to rely on Sandoz's published AWPs was "the best and most efficient way for [Mississippi Medicaid] to obtain accurate pricing information for Sandoz drugs."[5]

¶13.    Mississippi Medicaid was not alone in relying on the numbers reported to First DataBank, and the evidence supported the finding that this reliance was reasonable. Forty-five similar programs nationwide used First DataBank to obtain AWPs. The industry did not expect Medicaid programs independently and continually to investigate the ever-changing actual price of 65,000 or more prescription drugs purchased by 900 or more pharmacies state-wide. As the trial court concluded, "because of the constantly changing prices for drugs on virtually a daily basis, obtaining this accurate information was virtually impossible considering DOM's lack of resources." Other jurisdictions agree. As Wisconsin successfully argued:

---

[5] This discredits the dissent's implication that Medicaid somehow copped out by setting reimbursement rates based on nationally available subscription numbers rather than by independently investigating and obtaining hundreds of thousands of individual invoices from pharmacies on a biweekly basis.

As with other states throughout the country, the solution that emerged was for pharmaceutical manufacturers like Pharmacia to report certain figures to calculate reimbursements. The most important of those figures was AWP. Pharmacia provided AWPs for its drugs to First DataBank, an independent company that organized and disseminated information regarding the pharmaceutical industry to Medicaid, which then plugged them into its reimbursement formula.

Pharmacia, as with all manufacturers, reported AWPs in agreement with Medicaid that the AWPs were supposed to reflect what the name suggested: the average price for which the drug was sold by the wholesaler to the pharmacy.

*State v. Abbott Laboratories*, 316 N.W. 2d 145, 152-3 (Wis. 2012). *See also **In re Pharm. Industry Average Wholesale Price Litigation v. AstraZeneca Pharmaceuticals LP.***, 582 F.3d 156 (1st Cir. 2009).

¶14.    First DataBank defined AWP as "the average price paid by the pharmacy to the wholesaler for a particular drug." Wetherbee testified that Medicaid's understanding of AWP was consistent with the idea that AWP was developed because there had to be some price which all parties could agree upon if machine processing of claims was to be possible, with AWP representing an average price which a wholesaler would charge a pharmacy for a particular product. First DataBank also stated that "AWP never means that every purchase of that product will be exactly that price. There are many factors involved in pricing at the wholesale level which can modify the prices charged even among a group of customers from the same wholesaler." The State never denied that these "many factors" informed its understanding of AWP, including that, to arrive at a true estimated acquisition cost, reimbursement based on AWPs should be discounted. However, Wetherbee testified, "all of

us who were involved in pharmacy reimbursement believed we were getting accurate information and we were paying a real estimated acquisition cost."

¶15.    Undisputed is that pharmaceutical providers came to exaggerate exponentially their reported AWPs to the extent that the reported price, even as discounted, had zero relation to the pharmacies' actual acquisition costs.[6] This "spread" was then used as a marketing tool to gain pharmacy business in a competitive generic market.[7] The trial court concluded that the AWPs "were not prices at all – otherwise, if they had been, the State's reimbursement system would have worked as intended." Christopher Worrell, Sandoz's Vice President of Sales and Marketing from 2002 to 2005 and the individual responsible for assigning AWPs, denied that Sandoz had engaged in the practice of "marketing the spread" between AWPs

---

[6] The increasingly pervasive pharmaceutical practice of arbitrarily assigning artificially high drug prices for profit is currently at the forefront of the national conversation on healthcare costs and corporate ethics. *See* Andrew Pollack, Sabrina Tavernise, *A Drug Company's Price Tactics Pinch Insurers and Consumers*. N.Y. Times (Oct. 4, 2015), http://www.nytimes.com/2015/10/05/business/valeants-drug-price-strategy-enriches-it-but-infuriates-patients-and-lawmakers.html; Andrew Pollack, *Once a Neglected Treatment, Now an Expensive Specialty Drug,* N.Y. Times (Sept. 20, 2015), http://www.nytimes.com/2015/09/21/business/a-huge-overnight-increase-in-a-drugs-price-raises-protests.html.

[7] As explained in ***Abbott Laboratories***:

> Over time, however, the manufacturers began reporting inflated AWPs. They did so to engage in a practice known as "marketing the spread." When a manufacturer "marketed the spread," it reported an inflated AWP to Medicaid and Medicaid then paid the pharmacy more for the drug than the pharmacist paid the wholesaler for the same product. . . . Pharmacia "marketed the spread" along with its competitors, and it reported more and more dramatically inflated AWPs over time.

*Abbott Laboratories*, 816 N.W. 2d at 153.

and actual prices to gain pharmacy business. However, the court was presented with evidence supporting that Sandoz did "market the spread," including a 1992 letter to a customer stating "[w]e offer substantial margins between acquisition costs and [Average Wholesale Price] for your profit potential." In 1998, Sandoz bragged to a client that its reported AWP for Ranitidine was $86, but the acquisition price for the pharmacy would be only $7.16, a spread of 1,201 percent. Additionally, the court saw examples of confidential[8] offers to customers such as WalMart, listing under a description of the drug prices both the amount of the contract price and the different AWP amount. Evidence of this practice also was presented to the court in the form of the OIG investigative reports of the growing problem at a national level. Worrell also testified that he was aware "there was some other reimbursement formula that might use AWP" but that from his perspective "[i]t was a very small piece of the business." Presented with conflicting evidence, it was the place of the trial court, sitting as finder of fact, to weigh the credibility of the witnesses and evidence. The evidence supported the conclusion by the finder of fact that Sandoz advertised two key data points to its potential pharmaceutical customers: the actual cost of the drug and the fictional cost of the drug, and that Sandoz then reported the fictional cost of the drug to First DataBank, knowing that Medicaid programs relied on that data to calculate the actual cost of the drug.

---

[8] The confidential trade-secret nature of the spreads further served to prevent programs from ascertaining the exact degree of inflation relevant to local programs. Wetherbee testified that by the late 1990s, "I would say there was a great deal of information suggesting that AWP was a distorted or inflated figure[,]" but that "[w]hen I was at the Division of Medicaid, I did not know what the spread was." This quote explicitly rebuts the dissent's pervasive assertion that the State did not take the position below that it was aware that AWPs were inflated.

¶16. The evidence also is undisputed that Medicaid programs became increasingly aware that the reported AWPs were exaggerated and that they reacted to that awareness by increasing the discount of AWP. But a qualitative distinction exists between knowledge that an actual price is exaggerated and knowledge that a "price" is fictitious and assigned solely for the purpose of creating a fraudulent profit margin. The State persuasively demonstrates the distinction between knowing that a representation is likely to be only approximately true, versus knowing that it is a complete fabrication, by pointing to cases involving the sale of land. A defendant may know that a representation of a building's square footage is only approximate, or that a parcel of land is "about" a certain number of acres, but have a viable fraud claim where the represented numbers were "materially and unreasonably inaccurate" or "grossly erroneous." *See Kenneally v. Bank of Nova Scotia*, 711 F. Supp. 2d 1174, 1185-1186 (S.D. Cal. 2010).[9] This is an apt comparison to Mississippi Medicaid's understanding of the price AWP represented. Mississippi knew that AWP "never means that every purchase of that product will be exactly at that price" and that "many factors" are involved in pricing that can "modify" the actual price from the reported AWP. What the State was unaware of was the astronomical discrepancy between the actual cost and the reported AWP, a discrepancy that averaged 886% and caused Mississippi taxpayers to overreimburse pharmacies $23,661,618.

---

[9] *See also Parker v. Bennett*, 231 S.E. 2d 10, 12-13 (N.C. Ct. App. 1977) (reversing summary judgment for defendant who told buyers that parcel was "125 acres, more or less" but size was ninety-five acres).

¶17. To accept Sandoz's argument that the State knew the reported AWPs had zero relationship to actual cost would be to say that Medicaid essentially colluded with the generic drug industry for more than a decade in exploiting the inefficiencies inherent to a government bureaucracy in violation of Medicaid's own statutory and regulatory obligations. Wetherbee testified "[m]y basis [for understanding the meaning of AWP] was the universal awareness that we were a government program using public funds with a determination to be good stewards of the money, and I hope a reputation for integrity, basing our reimbursement on what we thought was accurate information."[10]

¶18. The court was presented with evidence supporting that the timing and degree of adjustments to Mississippi's reimbursement formula was reasonable given the State's lack

---

[10] The dissent's emphasis that Sandoz submitted "Average Manufacturer Prices," or AMPs, to First DataBank for the first six years of the damages period overlooks several relevant points. AMPs were used to calculate federal rebates, not reimbursement, and states actually were prohibited by CMS from using the AMP figure as a basis for reimbursement. Also, for the first four years of the implementation of OBRA '90, state reimbursement rates were frozen by federal law. We note the coincidence that Sandoz stopped providing that data to the subscription service after States' abilities to propose changes to their reimbursement formulas unfroze and as the confidentially marketed "spread" began to increase exponentially past anything expected or seen before. The early presence of the AMPs in First Data Bank does not defeat the trial court's ultimate determination of credibility upon weighing all of the evidence. Moreover, the burden was not on the State to ferret out the falseness of Sandoz's representation. The court found Wetherbee's testimony credible that:

> Well, the barrier was knowledge. I think if I had had an awareness of all of the problems associated with AWP that were developing or beginning to develop at that time, then the AMP would have meant much more to me. . . . I have since learned that states were prohibited by HCFA from using this AMP figure as a basis for their reimbursement. . . [reimbursement] is an accounting function, and the rebates were independent of the reimbursement. This was brand new to all of us. Rebate was a new game.

13

of knowledge of the degree of AWP inflation as it uniquely affected Medicaid reimbursement in Mississippi. The 1997 and 2002 OIG reports, while an important impetus to motivating investigation and (what is, by necessity a slow regulatory process) eventual change, were not immediately conclusory to Mississippi's individual concerns. Wetherbee explained:

> Mississippi is at the extreme, both in terms of its poverty level and the rural nature of its population demography so that what would apply in New York or California may or may not apply in Mississippi . . . in Mississippi we have higher level of people living below the poverty level and a greater number of people living in rural areas, because of which we would also have a higher proportion of community pharmacies in rural areas. So there were a lot of reasons why a generalized nationwide determination. . . would certainly be of interest but . . .I did not conclude that [the OIG report] was directly applicable to Mississippi. . . . It would be most likely that a chain pharmacy would be the beneficiary of some sort of purchasing contract or quantity discount that an independent pharmacy might enjoy.[11]

A subsequent "look-and-see" investigation by Medicaid Pharmacy Director Jack Lee into the pricing of a small handful of pharmacies led to a recommendation that "AWP minus 10 percent might no longer be applicable in Mississippi." The discount subsequently was raised–following CMS approval– to 12 percent and then again to 25 percent.[12] Mississippi could not act without accountability in setting a plan that would satisfy its regulatory

---

[11] The position of independent, rural pharmacies is born out in the current national conversation on healthcare costs. *See How Generic Drugs Can Cost Small Pharmacies Big Bucks*, National Public Radio, (Oct. 22, 2015, http://www.npr.org/sections/health-shots/2015/10/22/450600567/how-generic-drugs-can-cost-small-pharmacies-big-bucks (last visited Oct. 28, 2015).

[12] This Court acknowledged the practice of defining EAC as an increasing discount of Average Wholesale Price in **Jones v. Howell**, 827 So. 2d 691 (Miss. 2002).

obligation to reimburse at the lowest rate reasonably possible. Larry Reed, Technical Director of CMS's Division of Pharmacy, explained that CMS would not approve a state reimbursement plan that did not provide an acceptable method to arrive at the estimated cost for the drugs. Sandoz's own expert Robert Helms testified that CMS would not approve a change in the reimbursement formula that matched the highest OIG estimate of AWP inflation in other parts of the country. Wetherbee stated that, in a testament to the quality of work Mississippi invested in its proposed state plans, that Mississippi Medicaid "never had a federal disallowance with respect to our pharmacy reimbursement."

¶19.   The trial court was presented with evidence to support that Medicaid's reimbursement policies consistently were based on an understanding that adjusting the reported AWPs would arrive at its best estimate of the actual cost, factoring in unpredictable variations in regional markets. *See In re Pharm. Industry Average Wholesale Price Litigation*, 582 F.3d 156, 188 (1st Cir. 2009) (affirming finding that "costs of acquiring and acting upon the information necessary to understand the full extent of the AWP inflation were prohibitive.").

¶20.   In light of the conflicting testimony regarding the parties' understanding of the term AWP, the trial court appropriately rejected Sandoz's argument that all parties understood AWP to be a fictitious "term of art." Courts refrain from establishing a technical term of art when there is conflicting testimony regarding the definition of the term. *Commonwealth of Mass. v. Blackstone Valley Electric Co.*, 67 F.3d 981, 986 (1st Cir. 1995). A departure from the plain meaning of a term is only warranted when the term has a "well-defined" understanding within the relevant field in which it is used. *Corning Glass Works v.*

15

***Brennan***, 417 U.S. 188, 201-202, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974). Not only this litigation, but current litigation nationwide supports that AWP was not "well-defined" as a fictitious term of art having no value to reimbursement calculations. The trial court exhaustively considered the evidence before it, and we cannot find that the trial court manifestly erred in determining that Sandoz's conduct rose to the level of common-law fraud.

*Mississippi's Consumer Protection Act.*

¶21.    The trial court found that "Sandoz's submission of [Average Wholesale Prices] to [First Data Bank] that have no predictable relationship to what customers pay for its drugs while knowing Mississippi relied on this information in determining [Estimated Actual Cost] is an unfair and deceptive trade or practice within the meaning of Mississippi's Consumer Protection Act. Mississippi's Consumer Protection Act (CPA) prohibits "unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." The CPA additionally prohibits "misrepresentations of fact concerning the reason for, existence of, or amounts of price reductions." *See* Miss. Code Ann. § 75-24-5 (Rev. 2009). The purpose of the CPA is "to protect the citizens of Mississippi from deceptive and unfair trade practices." ***Holman v. Howard Wilson Chrysler Jeep, Inc.***, 972 So. 2d 564, 572 (Miss. 2008).

¶22.    Mississippi does not require a finding of fraud for an act to be deemed unfair or deceptive, making our affirmance of the trial court's judgment on this issue even easier than affirming its finding of fraud above.  ***Holman v. Howard Wilson Chrysler Jeep, Inc.***, 972 So. 2d 564, 572 (Miss. 2009); *see* also ***AstraZeneca***, 582 F.3d at 184 (holding act or practice

16

can be unfair or deceptive even if no violation of common law); ***Wash. State Physicians Ins. Exch. & Ass'n v. Fisions Corp.***, 858 P.2d 1054, 1063 (Wash. 1993) (affirming jury verdict for violation of similar statute when jury also returned verdict denying fraud claim).

¶23.    Rather, when "construing what constitutes unfair or deceptive trade practices . . . the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USCS 45(a)(1)) as from time to time amended." Miss. Code Ann. § 75-24-3. A trade practice is unfair if it (1) causes or is likely to cause a substantial injury; (2) the injury is not "outweighed by any countervailing benefits to consumers or competition that practice produces;" and (3) the injury could not have been "reasonably avoided." 15 U.S.C. § 45(n)(1980). In reviewing whether a trade practice is unfair, the FTC "may consider established public policies as evidence to be considered with all other evidence."

¶24.    Evaluating these factors, we find that the trial court did not manifestly err in determining that Sandoz's conduct was unfair and deceptive within the meaning of Mississippi's Consumer Protection Act. Sandoz's unfair reporting of fictitious AWPs caused the substantial injury of $23,661,618 in overpayments to pharmacies participating in Medicaid. No "countervailing benefits to consumers or competition" resulted from Sandoz's conduct. And we already have discussed above that Medicaid's reliance on the reported AWPs, which mirrored the practice of similar programs nationwide, was reasonable. The trial court did not err in finding that Medicaid should not have had pharmacies submit cost information for every Medicaid reimbursement submission. *See **AstraZenca***, 582 F.3d at 188

(affirming finding that "costs of acquiring and acting upon the information necessary to understand the full extend of the AWP inflation were prohibitive."); *Abbott Labs.*, 341 Wis. 2d at 524-25 ("Because of the complexity and dynamism of the pharmaceutical industry, Medicaid required a consistent and broadly applicable formula for determining the appropriate reimbursements for pharmacies. . . .").

¶25.    The trial court did not err in rejecting Sandoz's argument that the State is not a consumer for purposes of the Act. Mississippi is not the first jurisdiction to conclude that the inflation of Average Wholesale Prices violates standard Consumer Protection Act provisions and that the State is appropriately viewed as a consumer for purposes of the act. As the trial court stated "[s]ignificantly, Courts involved in virtually identical AWP litigation in other jurisdictions have applied similar State Consumer Protection Acts and rejected identical arguments as Sandoz asserts here. 'It is apparent that the State is the ultimate purchaser in the chain of distribution and the one directly affected by the alleged manipulation of the AWP.'" *See Idaho v. Alpharma, USPD, Inc.*, No. CV-0C-0701847 (Id. Dist. Ct. Aug. 31, 2007); *Kentucky v. Alpharma, USPD, Inc.*, No. 04-CI-1487; *Common Wealth of Pennsylvania v. Bristol-Myers Squibb Co.*, No. 212 M.D. 2004 (Pa. Commw. Ct. Sept. 10, 2010); *Commonwealth v. Johnson & Johnson*, No. 212 M.D. 2004 (Pa Commw. Ct. Dec. 7, 2010); *see also In re Pharmaceutical Industry Average Wholesale Price Litigation v. AstraZeneca*, 582 F.3d 156 (1st Cir. 2009) (affirming trial court's finding drug company liable for unfair and deceptive business practices for publishing inaccurate "average wholesale price").

¶26.    The trial court did not err in finding that Sandoz's practice of reporting false AWPs was a deceptive trade practice. The "prices" were exaggerated to an extent that they were not even prices. Providing false information is deceptive and violates the Act. *See Holman*, 972 So. 2d at 571-72; *S.W. Starving Artists Group, Inc. v. State*, 364 So. 2d 1128, 1131 (Miss. 1978). *People v. Pharmacia Corp.*, 895 N.Y.S.2d 682, 693-94 (N.Y. Sup. Ct. 2010) (holding that where pharmaceutical company knew of reliance on its published prices, it "had an obligation to refrain from reporting prices in a fraudulent or deceptive manner or causing fraudulent or deceptive prices to be published.").

*The State's Cross-Appeal*

**I.      The trial court did not abuse its discretion by denying the State's request for attorneys' fees.**

¶27.    The State first requested attorneys' fees in its motion to alter the final judgment. The trial court denied the State's motion. The State argues that the trial court erred by declining to award attorneys' fees because attorneys' fees should be awarded whenever punitive damages are awarded, and because the State was entitled to recover attorneys' fees under the CPA. *See* Miss. Code Ann. § 75-24-19(1)(b) (Rev. 2009).

¶28.    "Absent some statutory authority or contractual provision, attorneys' fees cannot be awarded unless punitive damages are also proper." *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 486 (Miss. 2002). When punitive damages are awarded, a post-judgment request for attorneys' fees is proper. *Fulton v. Miss. Farm Bureau Cas. Ins. Co.*, 105 So. 3d 284, 285 (Miss. 2012). But even when punitive damages are appropriate, "the allowance and the amount of a fee is a matter committed to the sound discretion of the trial judge." *Smith v.*

*Dorsey*, 599 So. 2d 529, 550 (Miss. 1992). "Attorney fees *may* be awarded in cases where punitive damages are proper . . . ." *Valley Forge Ins. Co./CNA Ins. Co. v. Strickland*, 620 So. 2d 535, 542 (Miss. 1993) (emphasis added). And an award of attorneys' fees to the Attorney General is discretionary under the CPA. Miss. Code Ann. § 75-24-19(1)(b) (Rev. 2009) ([t]he Attorney General *may* also recover . . . a reasonable attorney's fee) (emphasis added).

¶29.   Whether or not to award attorneys' fees is within the sound discretion of the trial court. *Smith*, 599 So. 2d at 550. Contrary to the State's arguments, a punitive damages award does not mandate an award of attorneys' fees; whether to award attorneys' fees always remains within the trial court's discretion. *Smith*, 599 So. 2d at 550. Nor does the CPA make an award of attorneys' fees mandatory upon the State's recovery of penalties. Miss. Code Ann. § 75-24-19(1)(b) (Rev. 2009). Rather, because the CPA states that the Attorney General *may* recover attorneys' fees, the decision to award attorneys' fees under the CPA is within the discretion of the trial court. Miss. Code Ann. § 75-24-19(1)(b) (Rev. 2009). We cannot say that the trial court abused its discretion in denying the State's request for attorneys' fees.

II.   **The trial court did not abuse its discretion by declining to award prejudgment interest.**

¶30.   An award of prejudgment interest is within the trial court's discretion. *In re Estate of Smith*, 69 So. 3d 1, 4 (Miss. 2011). The trial court declined to award prejudgment interest on the State's successful common-law fraud claim.[13] Citing *Upchurch Plumbing, Inc. v.*

---

[13] The trial court correctly held that no prejudgment interest was available on the CPA claim because the CPA does not provide for prejudgment interest.

20

*Greenwood Utilities Commission*, 964 So. 2d 1100, 1117 (Miss. 2007), the trial court found that prejudgment interest would not be allowed because the fraud claim was unliquidated. *Upchurch* held that "prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made or where the denial of a claim is frivolous or in bad faith." *Id.* (quoting *Stockstill v. Gammill*, 943 So. 2d 35, 50 (Miss. 2006)).

¶31.　The trial court's denial of prejudgment interest was within its discretion. "Prejudgment interest 'is not imposed as a penalty for wrong doing; it is allowed as compensation for the detention of money overdue.'" *Terex Corp. v. Ingalls Shipbuilding, Inc.*, 671 So. 2d 1316, 1323, 1324 (Miss. 1996) (*Sunburst Bank v. Keith*, 648 So. 2d 1147, 1153 (Miss. 1995)). Here, the damages were unliquidated, and the trial court did not find bad faith. While the State argues that Sandoz's fraudulent conduct was evidence of bad faith, "the primary focus of the law in this area concerns bad faith insurance claims," and this case does not involve a bad-faith denial of an insurance claim or of money due under a contract. *Terex Corp.*, 671 So. 2d at 1323. We affirm the trial court's denial of the State's prejudgment interest claim.

> **III.　The trial court appropriately applied the statutory punitive-damages cap to the State.**

¶32.　The State argues that, due to its sovereignty, this action is excluded from the punitive-damages cap in Mississippi Code Section 11-1-65(3)(a). Section 11-1-65(3)(a) states, in relevant part, that:

> (a) In *any civil action* where an entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed the following:

. . . .

> > (iv) Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000.00) for a defendant with a net worth of more than One Hundred Million Dollars ($100,000,000.00) but not more than Five Hundred Million Dollars ($500,000,000.00). . . .

Miss. Code Ann. § 11-1-65(3)(a) (Rev. 2014).

¶33. The State argues that its ability to recover damages cannot be limited by a statute unless the statute places an express limitation on the State. The State relies on ***Jackson v. Mississippi Building Commission***, 350 So. 2d 63, 64 (Miss. 1977). In ***Jackson***, the State Building Commission filed a complaint arguing that the City unlawfully had required the Commission to obtain a building permit and pay fees under municipal building codes. ***Id.*** at 63-64. A statute authorized the Commission to construct state buildings. ***Id.*** at 65-66. This Court held that the statutes granted the Commission plenary power to construct buildings, and the municipal building codes, which did not expressly subject the State to the codes, did not apply to the State. ***Id.*** at 66. ***Jackson*** cited common-law principles to the effect that statutes cannot divest the State's rights in general terms, but must express an intent to limit the State. ***Id.*** at 64-65. ***Jackson*** stated:

> By resorting merely to well-known principles of statutory construction, it is evident that the State may not be restricted in its sovereignty except by the specific provisions of its statutes.
> . . .
>
> [T]he Court said: "It is the settled doctrine that the general words of a statute do not include the State, or affect her rights, unless she be specially named, or it be clear and indisputable from the act that it was intended to include the State." . . . "It is undoubtedly the general rule that, where the effect of a statute is to restrict the rights of, or impose liabilities upon, the state or its political

22

subdivisions, it will be held to be inapplicable to them, unless they are included expressly or by necessary implication."

*Id.* (quotations omitted). *Jackson* also rested its holding upon the principle that a statute granting plenary power to a state agency supersedes any conflicting local or general regulations. *Id.* at 66.

¶34. A plain reading of Section 11-1-65(3)(a) indicates that it applies to actions by the State, either "expressly or by necessary implication." *Jackson*, 350 So. 2d at 65. Section 11-1-65 states that it applies to "any civil action" where an entitlement to punitive damages is established. Miss. Code Ann. § 11-1-65(3)(a). "[T]he word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5, 117 S. Ct. 1032, 1035, 137 L. Ed. 2d 132 (1997). "If the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction." *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1026 (Miss. 2011). We hold that, because the plain language of Section 11-1-65(3)(a) includes actions by the State, the trial court properly applied the statutory punitive-damages cap to the State.[14] And, although the State argues that it should be exempt from the caps because it brought the action on behalf of its citizens, an action by individual citizens would be subject to the caps, and the State cannot recover more for the citizens than the citizens themselves could recover.

---

[14] We note Sandoz's argument that one of the large punitive damages awards motivating tort reform in 2002 involved a $175 million verdict in favor of the Mississippi Tax Commission. While the statute is unambiguous and is not subject to construction, this argument supports that the legislative intent was that the punitive-damages caps apply to the State.

¶35. The State devotes a short paragraph in its brief to an argument that the Mississippi Constitution forbids the Legislature to abrogate the State's right to collect punitive damages. Because the State did not raise this argument before the trial court, it is procedurally barred from appellate consideration. "This Court's general policy is that 'errors raised for the first time on appeal will not be considered, especially where constitutional questions are concerned.'" *Powers v. Tiebauer*, 939 So. 2d 749, 752 (Miss. 2005) (quoting *Stockstill v. State*, 854 So. 2d 1017, 1023 (Miss. 2003)).

### IV. The trial court properly used Sandoz's net worth from the end of the prior fiscal year in capping punitive damages.

¶36. As an alternative to its argument that the statutory punitive-damages caps do not apply to it, the State argues that the trial court did not correctly evaluate Sandoz's net worth for the purposes of selecting the appropriate punitive-damages cap. Section 11-1-65(3)(a) caps punitive damages based on a defendant's net worth. Miss. Code Ann. § 11-1-65(3)(a) (Rev. 2014). The parties' discovery efforts yielded quarterly balance sheets beginning in 2010 for each quarter leading up to the March 2012 punitive-damages hearing, and monthly income statements from 2010 up to the date of the hearing. At the hearing, Sandoz presented testimony of chief financial officer James Mastakas that, according to generally accepted accounting principles, the net worth of Sandoz on December 31, 2011, was a number under five hundred million dollars.

¶37. Under Section 11-1-65(3)(a)(iv), if a defendant's net worth is between $100 million and $500 million, punitive damages are capped at $3.75 million. The State attempted to show that Sandoz's net worth in 2012 had risen to more than $500 million, which would have

24

entitled the State to $5 million in punitive damages under the applicable cap. During cross-examination of Mastakas, the State used 2012 balance sheets and income statements in an attempt to show that, after January 1, 2012, Sandoz's net worth had increased to more than $500 million. But Mastakas stated that the information used by the State was insufficient to calculate Sandoz's net worth after January 1, 2012, according to generally accepted accounting principles. The State presented no expert testimony establishing that Sandoz's net worth after January 1, 2012, exceeded $500 million under generally-accepted accounting principles.

¶38.    The trial court assessed punitive damages based on Sandoz's net worth as of December 31, 2011. The State argues that the trial court erred by using Sandoz's net worth as of December 31, 2011, rather than its net worth as of the date of the judgment on punitive damages. The State argues that the chancellor's use of December 31, 2011, as the valuation date was error because, in *Franklin Corp. v. Tedford*, 18 So. 3d 215, 241 (Miss. 2009), this Court held that net worth must be determined at the time of the judgment.

¶39.    "The proper assessment of punitive damages under Mississippi Code Section 11-1-65(3) is a question of law, to be reviewed by this Court de novo." *Id.* at 241. We find no error in the trial court's net-worth determination. Section 11-1-65(3)(b) states that "the amount of the net worth shall be determined in accordance with Generally Accepted Accounting Principles." Miss. Code Ann. § 11-1-65(3)(b) (Rev. 2014). In *Franklin*, the Court held that generally accepted accounting principles contemplate that net worth be the

current net worth, or the net worth at the time of the judgment on punitive damages.

*Franklin*, 18 So. 3d at 242. Quoting the trial court's opinion, the Court stated that:

> [T]he language of Miss. Code Ann. Section 11-1-65 which relates to the imposition of the legislative caps to a punitive damage award provides that the net worth of the defendant "shall be determined" in accordance with Generally Accepted Accounting Principles, and that *such language implies that the current net worth of the defendant is to be considered*. Further, other portions of the statute refer to the net worth of the defendant as a factor to be considered in an effort to determine the defendant's financial ability to pay the award, and likewise implies that the current net worth of the defendant is to be utilized. . . . Further, there is no language in the statute which provides that the past net worth of the defendant is to be utilized, and without such distinguishing language, *this court must apply the common meaning of the term "net worth," as well as the common interpretation as afforded by a reading of the statute as a whole*.

*Id.* (emphasis in original).

¶40. We observe that the trial court in *Franklin* used the defendant's net worth as of December 31, 2006, but the final judgment was not entered until May 31, 2007. *Id.* at 230. So, although *Franklin* stated that net worth should be calculated at the time of the judgment, it in fact affirmed a net-worth calculation from the time of the hearing. *Id.* Due to the practical limitations of computing net worth before the hearing date, in addition to the fact that presentation of evidence normally ends at the close of the hearing, we find that net worth should be calculated as near to the time of the hearing as practicality allows. The evidence must be sufficient to enable the trial court to determine the defendant's current net worth, according to generally accepted accounting principles. Miss. Code Ann. § 11-1-65(3)(b) (Rev. 2014).

26

¶41. We hold that the trial court's net-worth determination did not contravene *Franklin*. Sandoz proved that its most recent quarterly financial information showed that its net worth on December 31, 2011, was less than $500 million, according to generally accepted accounting principles. No evidence was before the trial court that Sandoz's net worth had exceeded $500 million by the time of the hearing. Mastakas refuted the State's suggestions to that effect on cross-examination, and the State presented no expert testimony by a qualified accountant that, according to generally accepted accounting principles, Sandoz's net worth currently exceeded $500 million. The trial court used the most recent quarterly financial information to determine Sandoz's net worth. The sole competent evidence of Sandoz's current net worth was presented by Sandoz, and the trial court appropriately credited the evidence and testimony that, under generally accepted accounting principles, Sandoz's net worth was less than $500 million.

**V.**      **The trial court correctly defined Sandoz's violation of the CPA as each publication of a false AWP, rather than each time Sandoz caused the State to overpay for a drug.**

¶42. The State argues that the chancellor erred in calculating the number of Consumer Protection Act violations by the number of occasions that Sandoz reported an AWP, rather than the number of occasions Medicaid reimbursed a claim using a reported AWP. The Chancellor found 2,699 violations and awarded the State $1,000 per violation.[15] While Mississippi does not have a statute or case on point, United States Supreme Court cases addressing similar penalties available under the federal False Claims Act and State cases

---

[15] The statute permits a penalty of up to $10,000 per violation.

addressing similar AWP litigation support the Chancellor's decision to apply the "per violation" language of Section 75-24-19(1)(b) to the number of occasions that Sandoz improperly set an AWP during the relevant damages period. In ***United States v. Bornstein***, 423 U.S. 303, 96 S. Ct. 523, 46 L. Ed. 2d 514 (1976), the United States Supreme Court held that, under the federal False Claims Act, which contains a similar per-violation penalty as Mississippi's CPA, "the focus in each case [must] be upon the specific conduct of the person from whom the Government seeks to collect the [penalties]." 423 U.S. at 313. There, the Court concluded that the number of violations were three fraudulent invoices issued by the defendant general contractor to a subcontractor, rather than the thirty-five subsequent invoices billed to the federal government from the subcontractor. The Wisconsin Supreme Court applied a similar approach in AWP litigation, stating that "[t]he number of times pharmacies were overpaid is merely a consequence of the alleged fraud, not the fraudulent conduct itself." ***Abbott Labs.***, 816 N.W. 2d at 173-74. We affirm the chancellor's use of the reported AWPs to calculate the number of violations under CPA. We also find that the trial court did not abuse its discretion in failing to award the maximum $10,000 per-violation penalty for the CPA violations.

### VI. The trial court did not err in dismissing the State's statutory claim under the Medicaid Fraud Control Act.

¶43. The State argues that the trial court erred in dismissing the State's statutory claim under the Medicaid Fraud Control Act on the ground that the Act's civil liability provision is inapplicable to Sandoz. The MFCA's civil liability provision states:

28

A health care provider or vendor committing any act or omission in violation of this article shall be directly liable to the state and shall forfeit and pay to the state a civil penalty equal to the full amount received, plus an additional civil penalty of triple the full amount received.

Miss. Code Ann. § 43-13-225(1). We affirm the trial court's dismissal of the MFCA claims on the ground that the civil liability provision does not provide for recovery beyond the amount the defendant has improperly received. The parties do not dispute that Sandoz never received any direct payment from the State, and under the language of this statute the parties are too far removed to permit recovery. As the trial court noted in its opinion, in 2006, 2007, and 2010, the Mississippi Legislature considered bills that would have replaced the "full amount received" language with language that permits recovery for the "amount of damages that the State sustains because of the act of that person." The fact that the Mississippi Legislature considered such a change demonstrates its recognition that the existing penalty provision was limited to the amount a provider or vendor received and thus required an amendment if it was to also cover the amount of the State's loss. We therefore affirm the trial court on this issue.

**CONCLUSION**

¶44. On our deferential standard of review, we affirm the trial court's finding that Sandoz committed common law fraud and violated the Mississippi Consumer Protection Act. Mississippi Medicaid reasonably relied on Sandoz's fictitious Average Wholesale Prices to reimburse pharmacies in excess of the Estimated Acquisition Cost of the drugs. We find the State's issues on cross-appeal to be without merit. We affirm the trial court's judgment in all respects.

¶45. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED.**

**KITCHENS AND KING, JJ., CONCUR. RANDOLPH, P. J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LAMAR, PIERCE AND COLEMAN, JJ. LAMAR, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., PIERCE AND COLEMAN, JJ. WALLER, C.J., NOT PARTICIPATING.**

**RANDOLPH, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶46. I am constrained to specially concur, while maintaining that the issuance of a judgment of affirmance is the only appropriate disposition of the case *sub judice*. Today, four justices agree to affirm the chancellor's judgment, and four justices disagree. Thus, the judgment of the chancery court should be affirmed. *See **Rockett Steel Works v. McIntyre***, 15 So. 2d 624 (Miss. 1943) ("Three of the judges of this Court are of the opinion that the judgment of the court below should be affirmed, and three [are] of the opinion that it should be reversed; consequently, that judgment must be, and is affirmed.").

¶47. Courts of our nation recognized early on that competing opinions of an evenly divided court should be rejected, for they fail to offer any precedential value. I remain perplexed by this Court's recent reluctance[16] to apply the principle of law announced by no lesser authority than Chief Justice John Marshall and applied by numerous justices who followed him in the United States Supreme Court. In ***Etting v. Bank of United States***, 24 U.S. (11 Wheat.) 59, 78, 6 L. Ed. 419 (1826), Chief Justice Marshall wrote, as follows:

> No attempt will be made to analyze [the parties' arguments and cited cases], or to decide on their application to the case before us, because the Judges are

---

[16] *See **Cowart v. State***, No. 2012-KA-02051-SCT, 2015 WL 110612, at \*17 (Miss. Jan. 8, 2015); ***Hentz v. State***, 152 So. 3d 1139, 1143 (Miss. 2014).

divided respecting it. Consequently, the principles of law which have been argued cannot be settled; but the judgment is affirmed, the court being divided in opinion upon it.

*Etting*, 24 U.S. at 78. In ***Durant v. Essex Co.***, 74 U.S. (7 Wall.) 107, 19 L. Ed. 154 (1868), addressing the effect of affirmance by an equally divided court, Justice Field wrote that:

There is nothing in the fact that the judges of this court were divided in opinion upon the question whether the decree should be reversed or not, and, therefore, ordered an affirmance of the decree of the court below. The judgment of affirmance was the judgment of the entire court. The division of opinion between the judges was the reason for the entry of that judgment; but the reason is no part of the judgment itself.

*Durant*, 74 U.S. at 110. The U.S. Supreme Court has further explained that:

it is obvious that that which has been done must stand unless reversed by the affirmative action of a majority. It has therefore been the invariable practice to affirm, without opinion, any judgment or decree which is not decided to be erroneous by a majority of the court sitting in the cause. . . . [A]n affirmance by an equally divided court is . . . a conclusive determination and adjudication of the matter adjudged; but the principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in this or in inferior courts.

*Hertz v. Woodman*, 218 U.S. 205, 212-14, 30 S. Ct. 621, 622-23, 54 L. Ed. 1001 (1910).

¶48. Our Court previously has addressed this issue and cited other state supreme court decisions which conformed to this principle. In ***Wise v. Valley Bank***, 861 So. 2d 1029 (Miss. 2003), this Court held that:

When this Court is evenly divided, it must affirm the judgment of the court from which the appeal is taken, even if that judgment is from the Court of Appeals. There is a long standing history in this regard. Other states have historically done the same. In ***Tate v. Christy***, 339 N.C. 731, 454 S. E. 2d 242 (1995), the North Carolina Supreme Court held that the decision of the Court of Appeals would be left undisturbed where the participating members of the Supreme Court were evenly divided as to affirmance or reversal. In ***Pierce v.***

31

*Pierce*, 244 Kan. 246, 767 P.2d 292 (1989), the Kansas Court of Appeals affirmed the trial court's holding. On review by the Kansas Supreme Court, the justices were evenly divided; therefore, the court affirmed the Court of Appeals, which had affirmed the district court judgment. In *Getschow v. Commonwealth Edison Co.*, 99 Ill. 2d 528, 77 Ill. Dec. 83, 459 N. E. 2d 1332 (1984), the Illinois Supreme Court ruled that where it was evenly divided on a portion of the judgment, the Appellate Court's judgment would stand. In *Christensen v. Epley*, 287 Or. 539, 601 P. 2d 1216 (1979), the Oregon Supreme Court was evenly divided on one issue of the case, which had been heard by the Court of Appeals; therefore, the decision by the Court of Appeals on that one issue was affirmed. In *Benson v. First Trust & Savings Bank*, 105 Fla. 135, 145 So. 182 (1932), the justices of the Florida Supreme Court on second rehearing were equally divided; therefore, the Supreme Court's judgment on the first rehearing was sustained.

We hold that when this Court is evenly divided, the order or judgment of the court from which the appeal is taken must be affirmed.

*Wise*, 861 So. 2d at 1032-33.

¶49.   We should dispose of the case with a short opinion or order, similar to the order issued by this Court in *Beecham v. State*, 108 So. 3d 394 (Miss. 2012). In *Beecham*, this Court entered an En Banc Order, holding that, because the judgment of the Court of Appeals had not been decided to be erroneous by a majority of the Court, the Court must affirm, without opinion, the judgment of the Court of Appeals. *Id.*

¶50.   Not one justice in this case, or our predecessors, has articulated a valid reason or offered contrary authority why this principle should not be followed. Accordingly, I submit the chancellor's judgment should be affirmed without opinion, as his opinion and judgment have not been determined erroneous by a majority of the justices.

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶51. Any shame brought to light by this case does not lie at the feet of Sandoz, Inc., but rather at the feet of the State itself. Sandoz submits for publication an index called the AWP (average wholesale price) for its drugs. This index does not—and for at least the past quarter century, has not intended to—represent the actual price pharmacies pay Sandoz for pharmaceuticals. The Mississippi Division of Medicaid knows this and has known it for decades. So has the Mississippi Legislature.

¶52. The price the Division of Medicaid has reimbursed pharmacies for drugs has been set by that agency and by the Legislature, and that price has been below AWP for at least the past twenty-five years. As Justice Lamar points out in her dissent—*from evidence in the record*—during the very same period of time

> the State is claiming Sandoz's 57 percent markup is so high it constitutes fraud, the State was specifically told by federal Medicaid officials that generic AWPs were between 42 and 65 percent higher than actual prices.

¶53. In fact, as Justice Lamar goes on to point out *from evidence in the record*, the federal government *in 1975* issued new federal medicare regulations and a statement that fully informed the states that AWP did not represent the prices pharmacies were actually paying for drugs. And as Justice Lamar further points out *from the evidence in the record*, "[t]he State's own drug-pricing expert admitted that this statement put Mississippi on notice ***in 1975*** that AWPs were not based on actual prices." (emphasis added).

¶54. I am not attempting to improve on Justice Lamar's well-written dissent which, in my view, is exactly correct and with which I fully join. But I do wish to amplify that, unlike her excellently researched dissent—that is based on evidence in the record—, much of what the

33

State argues—and which is parroted today by Justice Chandler's opinion—has no support in the record. In fact, many of the State's arguments are flatly contradicted by the record. I echo the Kentucky Court of Appeals which, after thoughtful analysis, rejected that state's AWP fraud claims:

> Frankly, it is appalling that the Commonwealth had actual knowledge of this "shell game" method of pricing employed by the drug companies, the wholesalers, and the pharmacists. However, even more appalling is the fact that, in spite of that knowledge, it acquiesced, billed accordingly, *and now seeks reimbursement by way of compensatory and punitive damages.*[17]

¶55.    There is no fraud here. At oral argument, the State was unable to articulate evidence in the record supporting the elements of fraud. Indeed, Justice Chandler's opinion—which, incidently, is neither a majority nor plurality opinion—makes no attempt whatsoever to analyze all the elements of fraud. This case represents nothing resembling an application of the law to the facts. Rather, it is a stark abuse of power by the State that serves to cover the State's own failure to act on information in its possession and to negotiate a better deal for Mississippi taxpayers. For these reasons, I dissent.

**LAMAR, PIERCE AND COLEMAN, JJ., JOIN THIS OPINION**.

**LAMAR, JUSTICE, DISSENTING:**

¶56.    Because the State wholly failed to prove fraud or a violation of the Consumer Protection Act, I dissent. But before I can discuss the merits of this decision, I must provide necessary evidence omitted from Justice Chandler's opinion.

---

[17] *Sandoz Inc. v. Commonwealth ex rel. Conway*, 405 S.W.3d 506, 511 (Ky. Ct. App. 2012) (emphasis added).

¶57. The State claims that Mississippi's Division of Medicaid (Medicaid) over-reimbursed pharmacies for certain generic drugs because manufacturers intentionally published a price—called the Average Wholesale Price, or AWP—for its drugs that was not an actual average and was higher than it should have been. Specifically, the State claims that, because of Sandoz's inflated AWPs, pharmacies actually were buying Sandoz's drugs at a price fifty-seven percent below Medicaid's reimbursement rate. According to the State, Sandoz benefitted from this practice by marketing the profit potential it produced—pharmacies could make money buying Sandoz's drugs at one price, then could get reimbursed by the State at a higher rate that was based on the drug's AWP.

¶58. The State's case rests on the premise that Sandoz caused to be published AWPs that were higher than the prices pharmacies actually were paying and that this resulted in the State reimbursing pharmacies at an inflated price, because the State was entitled to believe—and did believe—that AWP represented actual average wholesale prices.

¶59. Sandoz does not deny that its AWPs were not actual averages. And there is no dispute that pharmacies paid an average of fifty-seven percent less than what Medicaid reimbursed for Sandoz products. But Sandoz presented evidence that the whole pharmaceutical industry—including Medicaid—has known for decades that AWPs are not based on actual transaction prices and are meant to be suggested or benchmark prices. Since the 1970s, federal Medicaid officials have warned all Medicaid-participating states that AWPs are not actual averages and are not based on or closely related to the prices pharmacies paid, and that, as a result, they are an unreliable basis for reimbursement. The State previously has

35

expressly acknowledged these warnings, and its own published definition of AWP calls it a suggested price and not an actual average. Perhaps most significantly, while the State is claiming Sandoz's fifty-seven percent markup is so high it constitutes fraud, the State was specifically told by federal Medicaid officials that generic AWPs were between forty-two and sixty-five percent higher than actual prices. And Medicaid's own pharmacy director did a study that showed reimbursements for generics might have been as much as forty percent higher than pharmacies' actual costs.

¶60. The damages period alleged by the State is January 1, 1991, to October 20, 2005. Medicaid admittedly did not reimburse any claims during this damages period at 100 percent of AWP. Rather, they were all reimbursed at a discount off AWP depending on what formula was in place at the time.[18] In 1990, Medicaid set EAC at AWP minus ten percent. Medicaid considered this rate a "compromise" because, in response to pressure from the Mississippi Pharmacists Association, Medicaid got permission from federal Medicaid officials to set that rate in lieu of doing an actual survey of drug costs. In other words, Medicaid chose to set the reimbursement rate based on negotiations with the pharmacists rather than on actual acquisition costs. In 2002, the Legislature gave itself, rather than Medicaid, authority to define EAC and changed it from AWP minus ten percent to AWP minus twelve percent. *See* 2002 Miss. Laws Ch. 636B § 1. In 2004, the Legislature once

---

[18]This formula—called the Estimated Acquisition Cost, or EAC—was used only when it yielded the lowest reimbursement rate for generic drugs, which, during this damages period, was less than half the time. This was true because most of the drugs were reimbursed at the mandatory Federal Upper Limit, or FUL.

again delegated the authority to define EAC back to Medicaid, and on July 1, 2005, Medicaid set the rate at AWP minus twenty-five percent, *which is where it remains today.*

***What Federal Medicaid Officials Told Mississippi About Using AWP***

¶61.    The acronym AWP ceased to represent actual averages at some point prior to 1975 (fifteen years before our damages period here). The federal government publicly acknowledged this and has warned against using AWP as a basis for reimbursement—without verification of actual transaction prices—ever since.   In 1975 federal officials issued a statement that accompanied some newly issued Medicaid final rules. 40 Fed. Reg. 32284 (July 31, 1975).  That statement explained that the federal government had rejected the idea of basing drug reimbursements on AWP.  *Id.* at 32293.  The reason given was that AWP was "not currently determined by surveying drug marketing transactions (i.e., by determining the actual price a pharmacist pays to a manufacturer or wholesaler for a particular drug product), and thus published wholesale prices *often are not closely related to the drug prices actually charged* to, and paid by, providers."  *Id.*  (emphasis added). The State's own drug-pricing expert admitted that this statement put Mississippi on notice in 1975 that AWPs were not based on actual prices.

¶62.    In 1984 (seven years before our damages period), federal Medicaid officials again sent information to states, including Mississippi, regarding drug prices, urging them to "make a greater effort to determine more closely the price pharmacists pay for drugs rather than using AWP."  That was based on an attached report from the Health and Human Services (HHS) Office of the Inspector General (OIG), which had found that "pharmacies do not purchase

drugs at the AWP published in the 'Bluebook,' 'Redbook,' or similar publications. Thus AWP cannot be the best—or even an adequate—estimate of the prices providers generally are paying for drugs."

¶63.    The next year, 1985 (six years before our damages period), HHS sent a letter to Medicaid warning of impending corrective action if Medicaid continued to use a flat AWP as the basis for reimbursement. Medicaid Director B.F. Simmons wrote back to HHS, assuring it that "[t]he content of [its] letter was no surprise to us here in Mississippi." This warning came on the heels of a regional workgroup that had come up with a preferred reimbursement methodology that would result in a rate that was about fourteen percent lower than AWP. Jim Steele, a Medicaid employee at the time, who would later become Medicaid's pharmacy director, participated in that regional workgroup, which was designed to come up with a better reimbursement basis than AWP, since AWP was not related to transaction prices.

¶64.    But Medicaid did not change the reimbursement methodology, so in January 1989 (two years before our damages period), HHS sent another letter to state Medicaid officials stating that "nondiscounted or unmodified AWP is not acceptable for State use as the basis for estimated acquisition cost (EAC), absent any compelling evidence to the contrary. [Medicaid] policy is that *there is a preponderance of the evidence that indicates that AWP significantly overstates the prices that pharmacists are currently paying for drug products*." (Emphasis added.)

38

¶65.    Later in 1989, HHS again wrote to Medicaid, this time specifically outlining the parts of Mississippi's state plan that were out of compliance and the steps needed to bring them into compliance.  Among other problems, the letter pointed out that Mississippi used "[n]on-discounted average wholesale price . . . to establish the EAC for single-source drugs.  There is a preponderance of the evidence which indicates that AWP does not represent the price generally and currently paid by providers for a drug."  The letter also warned that "an arbitrarily assigned discount of the AWP is unacceptable also.  The discount must be justified and substantiated by data."

¶66.    A 1997 study by the Office of the Inspector General (OIG) "estimate[d] that, on average, actual acquisition cost of generic drugs was 42.5 percent below AWP."  The report of the study was sent to Mississippi and other states.  The OIG again reported on actual costs versus AWP in March 2002, this time finding that the difference had grown to an average of 65.93 percent for generic drugs.[19]

---

[19]Without any record support, or sound reason for doing so, the affirming justices give credence to the State's argument that it knew there was some inflation in AWPs, thus all this evidence of what federal officials told it about AWPs being inflated should not weigh against it. I see nothing in the record below that supports this claim. This lawsuit was pleaded, tried, and decided on the question of whether AWPs were supposed to mean the *actual* average of prices paid, not an inflated average. This is reflected in the State's original complaint, its Sandoz-specific complaint, its arguments and the testimony at trial, its damages calculation, and the trial court's amended opinion. The only testimony the State introduced regarding Medicaid's understanding of AWPs was that of Medicaid Executive Director Helen Wetherbee, and she plainly testified that "*any difference* between AWP and the actual average transaction prices would be inconsistent with [her] view of AWP." (Emphasis added.) The trial court's understanding of the State's position was "that the State understood and relied on the fact that Sandoz' AWPs meant just what the phrase says "Average Wholesale Prices," or the average of those prices that a wholesaler received from the sale of Sandoz' drugs to pharmacies . . . ." Conversely, the trial record is devoid of any argument or evidence on what the "expected exaggeration" was or how "far beyond" such expectations

### Other Pricing Data Available to Medicaid

¶67.    In addition to AWPs, Medicaid had other pricing data for Sandoz's drugs. Most importantly, for the first six years of the damages period, *Sandoz submitted the actual average prices that Mississippi retail pharmacies were paying for Sandoz's generic drugs.* These "Average Manufacturer Prices" (AMPs) were defined in a contract between Sandoz and Medicaid—and by federal statute—as "the average unit price paid to the Manufacturer for the drug in the States by wholesalers for drugs distributed to the retail pharmacy class of the trade . . . ." *See* 42 U.S.C. § 1396r-8(k)(1)(2000). In other words, AMPs represented the very number the State claims AWPs were supposed to represent. But AMPs were significantly lower than AWPs. In fact, one document produced by the State in discovery showed that, sometime after 1991, a Medicaid employee compared some AMPs to some AWPs and determined that there was an eighty-three percent difference in the two. Yet, inexplicably, Medicaid continued to use AWPs to set the reimbursement rate.

¶68.    Medicaid also had access to the price Sandoz charges wholesalers for its drugs, not including any applicable discounts, called a Wholesale Acquisition Cost, or WAC. First DataBank published these WACs alongside AWPs, and there is no dispute that Medicaid had

---

Sandoz's AWPs were. This Court "do[es] not consider issues raised for the first time on appeal," ***Jones v. Fluor Daniel Servs. Corp.***, 959 So. 2d 1044, 1948 (Miss. 2007). As such, I think it is improper to consider this argument at all. But this information, admittedly received by the State, informed Medicaid that AWPs were not based on actual prices and were not closely related to prices. It also informed Medicaid that pharmacies were paying anywhere from forty-two to sixty-five percent less than AWP during the damages period. Medicaid's reimbursement rates were precisely within that range—at fifty-seven percent over actual prices. Given all this information in the State's possession, changing its argument on appeal does not help it much anyway.

access to these numbers. And while AWPs generally stayed the same, over time the WACs declined as increased competition and other factors drove prices down. One of Sandoz's experts testified that if AWPs were meant to be actual averages, this growing discrepancy would mean that, over time, wholesalers were earning bigger and bigger profits from the sale of generic drugs, while the manufacturers' profits were staying about the same. But the State's drug-pricing expert testified that this was not the case: wholesalers' profits were generally in the two-to-three percent range, regardless of AWP.

*The State's Only Medicaid Witness*

¶69. Helen Wetherbee was Executive Director of Medicaid from 1990 to 1999. She was the State's only witness from Medicaid. Wetherbee testified that Medicaid did receive the various OIG reports and information from federal Medicaid officials warning against the use of AWPs in reimbursement formulae, but that they were "[n]ot of immediate value" to Medicaid.

¶70. Throughout Wetherbee's directorship, Medicaid published a pharmacy manual that defined AWP as "the manufacturer's suggested wholesale unit price to retailers" with no mention of it being an actual average. Wetherbee acknowledged this fact but claimed it was just a "very unfortunate choice of words and [did] not comport with her understanding or the understanding [she] had with her staff." Instead, she claimed, "everything we did and everything we understood was based on the actual Average Wholesale Price, not any suggestion of a price." But she admitted that neither Sandoz nor any other drug company told her that AWPs were averages, and that no federal regulation defined the term. Her only

41

basis for believing that AWPs were an actual average was because "the words are what they are." Wetherbee also conceded that she could name no one else who ever had said they believed AWPs to be an actual average.

¶71. Jack Lee was one of the pharmacy directors under Wetherbee while she was director, and in 1997 he studied drug prices in Mississippi. Lee conducted the study by reviewing three years of invoices from two Mississippi pharmacies and determined that a more accurate discount for generic drugs may be AWP minus thirty to forty percent. Wetherbee testified that Lee "came to [her] with a recommendation that he thought that AWP minus 10 percent might no longer be applicable in Mississippi. And based on what he had found in the pharmacies that he had looked at he was thinking we might need to implement a deeper percent discount." Wetherbee testified that Medicaid took no action on these results, however, because of the small sample size and the fact that it "was not a formal study."

¶72. Wetherbee left Medicaid in 1999. The State presented no other Medicaid witnesses or anyone who testified as to Medicaid's understanding of AWP from 1999 to the end of the damages period in 2005.

¶73. With this evidentiary background in mind, I now turn to the glaring deficiencies in the State's case, beginning with the common-law-fraud claim. While Justice Chandler's opinion correctly states the nine elements of fraud, it wastes no ink explaining how even one of the elements was met; much less all nine, and much less by clear and convincing evidence. And while I would find the State failed to prove several elements, the failure to prove even one element by clear and convincing evidence is fatal to its claim.

¶74. This Court has explained that "[c]lear and convincing evidence is of such a high order that [even] the overwhelming weight of the evidence falls short of being clear and convincing." *Kinney v. Catholic Diocese of Biloxi, Inc.*, 142 So. 3d 407, 418 (Miss. 2014) (quoting *Brothers v. Winstead,* 129 So. 3d 906, 915 (Miss. 2014)). Again, failure to prove even one element of fraud by clear and convincing evidence is fatal to its case, but I will focus my analysis on four of the elements: Sandoz's intent to deceive Medicaid; Medicaid's ignorance about what AWPs represented; Medicaid's reliance on AWPs as actual averages; and Medicaid's right to rely on Sandoz's AWPs as actual averages.

***No evidence in the record shows that Sandoz intended to deceive Medicaid.***

¶75. The State was required to prove by clear and convincing evidence that Sandoz possessed "an affirmative intent to deceive." *Russell v. S. Nat'l Foods, Inc.*, 754 So. 2d 1246, 1256 (Miss. 2000). This element "require[s] that the proof must establish an intent to deceive and this is *indispensable in [a fraud] action*." *Anderson Dunham, Inc. v. Aiken*, 241 Miss. 756, 133 So. 2d 527, 529 (1961) (emphasis added). The trial court concluded that "Sandoz submitted its AWPs to [First DataBank] with the intent of inducing Medicaid agencies such as Medicaid to rely on its AWPs in paying pharmacies for Sandoz'[s] drugs." But that conclusion fails to reach the disputed aspect of the intent-to-deceive element: whether Sandoz intended to deceive the State *into believing that AWPs were actual averages* rather than suggested prices. The State was required to prove either that Sandoz tricked the State into believing AWPs were actual averages, or that Sandoz knew the State believed that and did nothing to correct that belief. *See, e.g., State v. Cummings*, 203 Miss. 583, 35 So.

43

2d 636, 638 (1948) (explaining that fraud "consists in deception, intentionally practiced to induce another to part with property or to surrender some legal right . . . "). But the State presented no evidence to support either one of these, instead relying on evidence that "Sandoz was well aware that MS Medicaid's reimbursement methodology relied on reported AWPs."

¶76. Justice Chandler's opinion follows the trial court in emphasizing First DataBank's definition of AWP as "the average price paid by the pharmacy to the wholesaler for a particular drug." *See* Chandler Op. ¶5. But First DataBank's definitions have no bearing on whether Sandoz possessed the specific intent to deceive Medicaid into believing AWPs were actual averages, because there is no evidence anyone at either Sandoz or Medicaid ever saw those definitions. Wetherbee testified that she had never seen the definitions, nor could she name anyone at Medicaid who had seen them. She also could not name any other Medicaid employee who thought that AWPs were actual averages. Nor could she point to any statute, regulation, publication, definition, or other outside source for her belief that AWPs were meant to be actual averages.

¶77. And perhaps most significantly, Sandoz points out that it voluntarily submitted its actual average prices to the State for six years during the damages period, strong evidence that it did *not* intend for the State to interpret AWPs as actual averages. There is no dispute that Sandoz intended for Medicaid to receive and to rely on its AWPs as a basis for reimbursement formulae; but there is a complete absence of evidence that Sandoz intended

44

Medicaid to believe those were actual averages rather than a suggested price. In fact, the record amply supports the opposite conclusion.

¶78. Likewise, Sandoz had no reason to believe that Medicaid understood AWPs to be something other than a suggested price. Medicaid's publicly available pharmacy provider's manual defined AWP as a "suggested price," not an actual average. Finally, the only evidence that Medicaid believed AWPs were actual averages was Wetherbee's personal belief, a belief not shared, indeed contradicted, by the two pharmacy directors who worked under Wetherbee while she was director, and at least one of her predecessors as executive director. This Court has held that "proving fraud is difficult, as it ought to be. Clear and convincing evidence is required." *Martin v. Winfield*, 455 So. 2d 762, 764 (Miss. 1984). As such, I would find that the State wholly failed to prove intent to deceive.

***The State failed to prove that Medicaid was ignorant about what Sandoz's AWPs were.***

¶79. The State was required to prove by clear and convincing evidence that Medicaid was ignorant of the fact that Sandoz's AWPs were not actual averages of prices paid. *See Allen v. Mac Tools, Inc.*, 671 So. 2d 636, 642 (Miss. 1996). Neither Justice Chandler's opinion nor the trial court mentions or analyzes this *essential* element, but I would find that the record falls far short of supporting a finding that the State proved it by clear and convincing evidence. For one, Medicaid's own published definition of AWP confirms it was not ignorant at all, referring to AWP as a "suggested price," not an average. And Medicaid's own pharmacy director estimated that pharmacies were paying a thirty to forty percent less than published AWPs. Additionally, it is undisputed in this record that Medicaid received

45

warnings from the federal government about using AWPs for reimbursement for decades. The OIG reports foreclose any claim that Medicaid was ignorant that published AWPs were anything other than a suggested price. It was expressly informed that pharmacies were paying anywhere from 42 to 65 percent less than these published AWPs. Finally, the statement accompanying the Medicaid final rules, fifteen years prior to the damages period, forecloses any claim that Medicaid was ignorant of the fact that published AWPs were not based on actual transaction prices.

***The State failed to prove that Medicaid relied on Sandoz's AWPs as something other than a suggested price, or that such a reliance would have been reasonable.***

¶80.   I examine Medicaid's reliance and the reasonableness thereof together.  Here, the State was required to prove by clear and convincing evidence (1) that Medicaid relied on the representation that AWPs were averages of the prices pharmacies paid for generic drugs, and (2) that such reliance was reasonable.  ***Franklin v. Lovitt Equip. Co.,*** 420 So. 2d 1370, 1372 (Miss. 1982). The trial court did not make specific findings on this issue; rather, it summarily stated that "Medicaid reasonably relied on the information contained within Sandoz'[s] published AWPs."  That framing of the issue is unhelpful.  The State *did* rely on Sandoz's published AWPs, but the issue in this case is whether the State relied on those as *actual averages*, and whether such reliance was reasonable.[20]

---

[20]The State was required to prove this because that is what it pleaded in its complaint and what it argued before the trial court. On appeal, as mentioned above, its argument is that Medicaid "was entitled to rely on Sandoz's reported AWPs as having a reasonable relationship to a price." Notwithstanding the unworkable vagueness in that statement, even if that is what Medicaid *did* rely on, it does not change the reasonableness inquiry under these elements.

¶81.    One key indication that Medicaid did not actually rely on AWPs as literal averages is its own pharmacy manual, which defined AWPs not as an actual average, but as the "manufacturer's suggested price."  Wetherbee admitted that this contradicted what she claimed to be Medicaid's understanding of AWP and lamented that it was a mistake that should have been corrected but never was.  Medicaid's reliance on Sandoz's AWPs would show up primarily in how it set its reimbursement rates. It set those rates three times during this damages period, but the State failed to produce evidence showing that reliance on Sandoz's AWPs as an actual price—or anything other than a suggested price—played any part in setting those rates. In fact, the State failed to produce any testimony or affidavit of anyone who actually played a part in those rate changes.

¶82.    The trial court's analysis stopped short in that it determined only that the State relied on Sandoz's published AWPs, without requiring the State to prove by clear and convincing evidence that it relied on those AWPs *as actual averages*, which was the basis of the entire lawsuit.  I would hold that such an incomplete analysis constitutes error.

¶83.    And the trial court's analysis of the second prong—the reasonableness of Medicaid's reliance—is affected by the same error. It  ruled that it was reasonable for the State to rely on published AWPs but made no finding on whether it was reasonable to rely on those AWPs *as actual averages*.  This analysis relieved the State of its burden of proof and led to an erroneous finding.  The State claimed it was reasonable for it to rely on the published AWPs as actual averages of prices paid, because the publisher was the "gold standard" for pharmaceutical pricing.  It also pointed out that when the Omnibus Budget Reconciliation

47

Act (OBRA '90) increased the number of covered drugs from roughly 1,800 to nearly 65,000, the State was forced to automate and computerize the process. These facts do support the reasonableness of relying on a third-party publisher of drug-pricing information, but they provide no support for the reasonableness of relying on AWPs as something other than what Medicaid had for decades been told about AWPs.

¶84.  On the other hand, evidence in the record supports Sandoz's argument that, from the top of the federal government to Medicaid's executive director, and from 1975 to 2005, AWP universally was understood and treated as something other than an actual average of prices paid. Examples include the following:

> In 1985, the federal government warned Mississippi that AWP was not closely related to actual prices and threatened to withdraw its matching funds, which accounted for approximately eighty percent of Mississippi's Medicaid budget, if Medicaid continued to use a nondiscounted AWP for reimbursement.

> During the damages period, both President Clinton and Health and Human Services Secretary Donna Shalala publicly referred to AWP as a "sticker price."

> For the first six years of the damages period, Sandoz voluntarily submitted to Mississippi the prices pharmacies actually paid for its generic drugs. Those numbers showed a significant difference between actual prices and AWP.

> The State itself conducted a study in 1989 that indicated pharmacies did not pay AWP.

> The State's Medicaid witness and former Medicaid director told other states' Medicaid directors that Medicaid was "paying AWP - 10% and that is where the [pharmacies] are making their money."

> The State's drug-pricing expert acknowledged that federal Medicaid officials had, in 1975, "put Mississippi on notice" that AWPs were not closely related to actual prices.

¶85. The State did not dispute any of these facts, and in my opinion, the trial court erred when it dismissed all this as "scattered and sporadic knowledge of government employees" and as "certain State employees testif[ying] that they believed that Sandoz'[s] published AWPs were not true average wholesale prices received by Sandoz for its drugs . . . ." In sum, I echo the Alabama Supreme Court's conclusion, regarding this same AWP issue: "The idea of a person knowing a representation to be false and at the same time 'relying' thereon is a contradiction in terms." ***Sandoz, Inc. v. State***, 100 So. 3d 514, 532 (Ala. 2012).

***The State failed to prove that Sandoz's AWPs proximately caused Medicaid any injury.***

¶86. This Court has held that "recovery is not permitted if the proximate cause of the monetary loss is other than the fraud alleged." ***Russell v. S. Nat'l Foods, Inc.***, 754 So. 2d 1246, 1256 (Miss. 2000). Thus, the State was required to prove that if Sandoz had reported AWPs that were actual averages, Medicaid would have reimbursed pharmacies at those averages. The trial court made no specific findings on this element, only ruling that "Sandoz'[s] conduct caused Mississippi to overpay for its prescription drugs and as a result, Mississippi sustained proximate injury and damages as a result of Sandoz reporting false and inflated AWPs." But the record reveals no testimony from the State's witnesses, or other evidence presented at trial, asserting that the State would have reimbursed any differently had it known that AWPs were not actual averages.

¶87. The State does not even attempt to rebut this argument but simply points to the damages calculation to show that, because the State used AWP, it paid more than the average price. But this approach skips the causation inquiry and moves right to damages, bypassing

49

the disputed issue in the case. This Court has held that "[f]raud is never to be presumed or inferred, but must be proven by clear and convincing evidence." ***Boling v. A-1 Detective & Patrol Serv., Inc.***, 659 So. 2d 586, 590 (Miss. 1995) (citing ***Nichols v. Tri-State Brick & Tile, Co.***, 608 So. 2d 324, 330 (Miss. 1992)).

¶88.   The State neither presented at trial nor argued on appeal any evidence from the record that indicates Medicaid would have paid a different amount if it had known that AWPs were something other than actual average prices.  The fact is that, during the damages period, Medicaid never reimbursed at AWP; it always discounted that rate.  It received multiple reports that AWPs were not actual averages and, instead of making any effort to ascertain what those averages were, Medicaid made a policy decision to find a number that got federal approval and encouraged pharmacy participation, which is what it was required to do. Moreover, during the decade since Medicaid allegedly became aware of Sandoz's "fraudulent" AWPs, it has not changed the reimbursement formula. I would find that the trial court erred when it determined that State met its burden to prove causation by clear and convincing evidence.

***The State failed to prove that Sandoz violated the Consumer Protection Act.***

¶89.   As for the CPA claims, I would find that the State failed to prove that Medicaid was deceived because Medicaid was repeatedly told that AWPs are not actual average wholesale prices.  Justice Chandler's opinion ignores this and declares Sandoz's AWPs to be "false information," and therefore deceptive. One cannot help but wonder whether the affirming justices would find the term "over-the-counter drugs" deceptive if applied to a particular drug

that never traveled over an actual counter? What about the "world wide web," which is neither world-wide nor an actual web? The rule this Court announces today makes those terms false and therefore deceptive and a violation of our state's consumer-protection laws. Chandler's Op. ¶ 21. I find that silly.

¶90.    Instead, I would follow the Legislature's admonition and look to federal caselaw for guidance, and therefore use the test for deceptiveness the Federal Trade Commission has established: (1) "There must be a  representation, omission, or practice that is likely to mislead the consumer"; (2) "The act or practice must be considered from the perspective of the reasonable consumer"; and (3) "the representation, omission or practice must be material." FTC Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1984 WL 565319, at \*37 (Mar. 23, 1984).

¶91.    As to the first element, the Commission in *Cliffdale*, explained that "[t]he test is whether the consumer's interpretation or reaction is reasonable." *Id.* at 46. "When representations or sales practices are targeted to a specific audience, the Commission determines the effect of the practice on a reasonable member of that group." *Id.* For example, "a practice or representation directed to a well-educated group, such as prescription drug advertisement to doctors, would be judged in light of the knowledge and sophistication of that group." *Id.*

¶92.    Conversely, unreasonable interpretations do not give rise to claims of deception:

> Some people, because of ignorance or incomprehension, may be misled by even a scrupulously honest claim. Perhaps a few misguided souls believe, for example, that all "Danish pastry" is made in Denmark. Is it therefore an actionable deception to advertise "Danish pastry" when it is made in this

51

country? Of course not. *A representation does not become "false and deceptive" merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed.*

*Id.* at 47 (quoting *In re Heinz W. Kirchner*, 63 F.T.C. 1282, 1290 (1963)) (emphasis added).

¶93. By ignoring the "target-audience" requirement embodied in the first two prongs of the correct test, I would find that the trial court reached a wrong result when it determined Sandoz's published AWPs were deceptive. As far as this record shows, only one member of the target audience, Wetherbee, claimed to believe AWPs had any definition that would render them deceptive. There is no record evidence that any other person in her organization, the pharmaceutical industry, or elsewhere in government shared that understanding. On the contrary, the record establishes that individuals from all corners of the industry (including federal and state Medicaid officials, drug-company officials, First DataBank officials, other publishers of drug-pricing data, and the OIG) had the opposite understanding. As such, I would find that the chancellor's finding that Sandoz's practices were deceptive was manifestly against the weight of the evidence.

¶94. As for the unfairness claim, I would find that publishing AWPs that were consistent with everything Medicaid was told, publicly and privately acknowledged, and even published about AWPs is not likely misleading. Moreover, since Medicaid has known since the 1970s that AWPs are not based on actual prices, any injury caused by Medicaid relying on AWP as a number based on actual prices *was* reasonably avoidable, simply by heeding the federal government's thirty years of warnings.

¶95. At least as far back as 1975, the Mississippi Division of Medicaid was repeatedly informed—and warned—that AWPs were not based on transaction prices and were not an adequate basis for their reimbursement formulae. This is undisputed in the record. The State's reimbursement decisions were based on policy considerations, political neogtiations with the Pharmacists' Association, and requirements of the federal Medicaid program. In so doing, Medicaid succeeded in maximizing pharmacy participation and obtaining federal approval and matching dollars every year of this damages period. Although the State's reimbursement formula was based on AWPs provided by Sandoz, the State's claimed reliance on those numbers as actual averages or even exaggerated averages was not reasonable. I would reverse and render this judgment in favor of Sandoz.

**DICKINSON, P.J., PIERCE AND COLEMAN, JJ., JOIN THIS OPINION.**